485 A.2d 742

**Samuel FELD and Peggy Feld,**

v.

**John W. MERRIAM and Thomas Wynne, Inc., Co-Venturers, t/a Cedarbrook Joint Venture, and Globe Security Systems, Inc.**

**Appeal of John W. MERRIAM and Thomas Wynne, Inc., Co-Venturers, t/a Cedarbrook Joint Venture and Cross-Appeal of Samuel Feld and Peggy Feld.**

Supreme Court of Pennsylvania.

Argued Nov. 29, 1983.

Decided Dec. 18, 1984.

---

384

Marvin Comisky, William H. Roberts, John Rogers Carroll, Philadelphia, for appellant in No. 79 and for appellee in No. 80.

Marshall A. Bernstein, Philadelphia, for appellant in No. 80 and for appellee in No. 79.

Joseph R. Livesey, Philadelphia, for appellee in Nos. 79 and 80.

Before ROBERTS, C.J., and NIX, FLAHERTY, McDERMOTT, HUTCHINSON, and ZAPPALA, JJ.

### OPINION [1]

McDERMOTT, Justice.

Peggy and Samuel Feld were tenants in the large Cedarbrook Apartment complex, consisting of 150 acres and 1,000 apartments housed in three high rise buildings. For an

---

1. This case was reassigned to this author on May 16, 1984.

extra rental fee the apartments are serviced by parking garages adjacent to the apartment buildings. On the evening of June 27, 1975, about 9:00 P.M., the Felds, returning from a social engagement, drove as usual to their allotted space in the parking garage. Then began the events that brings before us the question of a landlord's liability for the criminal acts of unknown third persons. We are not unaware of the social, economic and philosophic dimensions of the questions posed.

While the Felds were parking their car, they were set upon by three armed felons. At gun point, accompanied by two of the felons, they were forced to the back seat of their car. Followed by the third felon in an "old, blue broken down car," they were driven past the guard on duty at the gate, out into the night, to the ferine disposal of three criminals. To clear the car for their main criminal purpose, the felons started to force Mr. Feld into the trunk of the car. Mrs. Feld pled her husband's illness and to save him, offered herself for her husband's life. Thereupon the felons released Mr. Feld on a deserted street corner and drove Mrs. Feld to the lonely precincts of a country club. There is no need to recite the horrors that brave and loving woman suffered. Suffice it to say they extorted a terrible penalty from her defenseless innocence.

The Felds brought suit against the appellees, owners of the complex,[2] alleging a duty of protection owed by the landlord, the breach of the duty, and injuries resulting therefrom. Named as defendants were John Merriam, Thomas Wynne, Inc., the Cedarbrook Joint Venture, and Globe Security Systems, Inc. Following an eight-day trial, the jury returned a plaintiff's verdict and a judgment totaling six million dollars against Merriam, Thomas Wynne,

2. Cedarbrook is owned by John W. Merriam, and Thomas Wynne, Inc. Merriam and Thomas Wynne, Inc. were co-venturers in a company trading as the Cedarbrook Joint Venture. Merriam owns all of Thomas Wynne, Inc.'s stock, and, at trial, was appropriately treated as Cedarbrook's sole owner.

Inc., and the Cedarbrook Joint Venture.[3]  The jury absolved Globe Security of any liability.  Common Pleas, per the Honorable Jacob Kalish, denied motions for a new trial, judgment N.O.V. and remittitur.

On appeal the Superior Court affirmed the lower court, with the exception that the award of punitive damages to Samuel Feld was reduced by one half.  Both Cedarbrook and Mr. Feld filed petitions for allowance of appeal, which were granted.  We now reverse.

## I

■  The threshold question is whether a landlord has any duty to protect tenants from the foreseeable criminal acts of third persons, and if so, under what circumstances.  Well settled law holds landlords to a duty to protect tenants from injury rising out of their negligent failure to maintain their premises in a safe condition.  *See Smith v. M.P.W. Realty Co. Inc.,* 423 Pa. 536, 225 A.2d 227 (1967).  *Lopez v. Gukenback,* 391 Pa. 359, 137 A.2d 771 (1958).  That rule of law is addressed to their failure of reasonable care, a failure of care caused by their own negligence, a condition, the cause of which was either known or knowable by reasonable precaution.  The criminal acts of a third person belong to a different category and can bear no analogy to the unfixed radiator, unlighted steps, falling ceiling, or the other myriad possibilities of one's personal negligence.  To render one liable for the deliberate criminal acts of unknown third persons can only be a judicial rule for given limited circumstances.

■  The closest analogy is the duty of owners of land who hold their property open to the public for business purposes.  *See Leary v. Lawrence Sales Corp.,* 442 Pa. 389, 275 A.2d 32 (1971).  They are subject to liability for the

---

**3.**  Samuel Feld was awarded $1 million in compensatory damages and $1.5 million in punitive damages.  Peggy Feld was awarded $2 million in compensatory damages and $1.5 million in punitive damages.  Delay damages, pursuant to Pa.R.Civ.P. 238, were assessed against Cedarbrook in the amount of $83,835.24.

accidental, negligent or intentionally harmful acts of third persons, as are common carriers, innkeepers and other owners of places of public resort. Section 344, comment (f) of the Restatement (Second) of Torts, adopted by this court in *Moran v. Valley Forge Drive-In Theater, Inc.*, 431 Pa. 432, 246 A.2d 875 (1968), requires that they take reasonable precaution against that which might be reasonably anticipated. The reason is clear; places to which the general public are invited might indeed anticipate, either from common experience or known fact, that places of general public resort are also places where what men can do, they might. One who invites all may reasonably expect that all might not behave, and bears responsibility for injury that follows the absence of reasonable precaution against that common expectation. The common areas of an apartment complex are not open to the public, nor are the general public expected or invited to gather there for other purposes than to visit tenants.

█ Tenants in a huge apartment complex, or a tenant on the second floor of a house converted to an apartment, do not live where the world is invited to come. Absent agreement, the landlord cannot be expected to protect them against the wiles of felonry any more than the society can always protect them upon the common streets and highways leading to their residence or indeed in their home itself.

█ An apartment building is not a place of public resort where one who profits from the very public it invites must bear what losses that public may create. It is of its nature private and only for those specifically invited. The criminal can be expected anywhere, any time, and has been a risk of life for a long time. He can be expected in the village, monastery and the castle keep.

In the present case the Superior Court departed from the traditional rule that a person cannot be liable for the criminal acts of third parties when it held "that in all areas of the leasehold, particularly in the area under his control,

the landlord is under a duty to provide adequate security to protect his tenants from the foreseeable criminal actions of third persons." *Feld v. Merriam, et al.,* 314 Pa.Super. 414, 427, 461 A.2d 225, 231 (1983).

■ The Superior Court viewed the imposition of this new duty as merely an extension of the landlord's existing duty to maintain the common areas to be free from the risk of harm caused by physical defects. However, in so holding that court failed to recognize the crucial distinction between the risk of injury from a physical defect in the property, and the risk from the criminal act of a third person. In the former situation the landlord has effectively perpetuated the risk of injury by refusing to correct a known and verifiable defect. On the other hand, the risk of injury from the criminal acts of third persons arises not from the conduct of the landlord but from the conduct of an unpredictable independent agent. To impose a general duty in the latter case would effectively require landlords to be insurers of their tenants safety: a burden which could never be completely met given the unfortunate realities of modern society.

■ Our analysis however does not stop here, for although there is a general rule against holding a person liable for the criminal conduct of another absent a preexisting duty, there is also an exception to that rule, i.e., where a party assumes a duty, whether gratuitously or for consideration, and so negligently performs that duty that another suffers damage. *Pascarella v. Kelley,* 378 Pa. 18, 105 A.2d 70 (1954). *See Rehder v. Miller,* 35 Pa.Super. 344 (1908).

This exception has been capsulized in Section 323, of the Restatement (Second) of Torts, which provides:

§ 323. Negligent Performance of Undertaking to Render Services

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical

harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking.

Previously we adopted this section as an accurate statement of the law in this Commonwealth. *Gradel v. Inouye*, 491 Pa. 534, 421 A.2d 674 (1980); *DeJesus v. Liberty Mutual Insurance Co.*, 423 Pa. 198, 223 A.2d 849 (1966).[4]

■ Expounding on the proper application of Section 323 the drafters indicated that

[T]his Section applies to any undertaking to render services to another which the defendant should recognize as necessary for the protection of the other's person or things. It applies whether the harm to other or his things results from the defendant's negligent conduct in the manner of his performance of the undertaking, or from his failure to exercise reasonable care to complete it or to protect the other when he discontinues it.

Comment (a) § 323 Restatement (Second) of Torts. These comments are particularly relevant in a situation such as the present where a landlord undertakes to secure the areas within his control and possibly fosters a reliance by his tenants on his efforts.

■ Absent therefore an agreement wherein the landlord offers or voluntarily proffers a program, we find no general duty of a landlord to protect tenants against criminal intrusion. However, a landlord may, as indicated, incur a duty voluntarily or by specific agreement if to attract or

4. Although in *DeJesus v. Liberty Mutual Insurance Co.*, 423 Pa. 198, 201, 223 A.2d 849, 850 (1966), we held that both subsections (a) *and* (b) would have to be met to support liability, later application of Section 323 clearly indicates that a party need only satisfy subsection (a) *or* (b). ·See *Hamil v. Bashline*, 481 Pa. 256, 392 A.2d 1280 (1978). See also, *Morena v. South Hills Hospital*, 501 Pa. 634, 462 A.2d 680 (1983).

keep tenants he provides a program of security.[5] A program of security is not the usual and normal precautions that a reasonable home owner would employ to protect his property. It is, as in the case before us, an extra precaution, such as personnel specifically charged to patrol and protect the premises. Personnel charged with such protection may be expected to perform their duties with the usual reasonable care required under standard tort law for ordinary negligence. When a landlord by agreement or voluntarily offers a program to protect the premises, he must perform the task in a reasonable manner and where a harm follows a reasonable expectation of that harm, he is liable. The duty is one of reasonable care under the circumstances. It is not the duty of an insurer and a landlord is not liable unless his failure is the proximate cause of the harm.

A tenant may rely upon a program of protection only within the reasonable expectations of the program. He cannot expect that a landlord will defeat all the designs of felonry. He can expect, however, that the program will be reasonably pursued and not fail due to its negligent exercise. If a landlord offers protection during certain periods of the day or night a tenant can only expect reasonable protection during the periods offered. If, however, during the periods offered, the protection fails by a lack of reasonable care, and that lack is the proximate cause of the injury, the landlord can be held liable. A tenant may not expect more than is offered. If, for instance, one guard is offered, he cannot expect the same quality and type of protection that two guards would have provided, nor may he expect the benefits that a different program might have provided. He can only expect the benefits reasonably expected of the program as offered and that that program will be conducted with reasonable care.

5. *See Phillips v. Chicago Housing Authority,* 89 Ill.2d 122, 59 Ill.Dec. 281, 431 N.E.2d 1038 (1982); *Pippin v. Chicago Housing Authority,* 78 Ill.2d 204, 35 Ill.Dec. 530, 399 N.E.2d 596 (1979); *Scott v. Watson,* 278 Md. 160, 359 A.2d 548 (1976).

In the present case the trial judge, when instructing the jury, was placed in the unenviable position of predicting how we would resolve this difficult question. Although we commend him on his endeavor, we are constrained to reverse the verdict, since the jury instructions which were given imposed upon the landlord a duty greater than that which we today hold to have existed.

## II

Cedarbrook also argues that the evidence of negligence failed to support the jury's punitive damages award, and that the introduction of evidence concerning appellant's considerable wealth was so prejudicial as to taint the jury's compensatory damages award. In light of our grant of a new trial on the issue of liability, the issues regarding damages are moot. However, in anticipation of the same issues arising at retrial, we will address them.

### A. Punitive Damages

This Court has embraced the guideline of Section 908(2) of the Restatement (Second) of Torts regarding the imposition of punitive damages: "Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." *See Chambers v. Montgomery*, 411 Pa. 339, 192 A.2d 355 (1963). Punitive damages must be based on conduct which is " 'malicious,' 'wanton,' 'reckless,' 'willful,' or 'oppressive' ..." *Id.*, 411 Pa. at 344–45, 192 A.2d at 358, *citing Hughes v. Babcock*, 349 Pa. 475, 37 A.2d 551 (1944).

Further, one must look to "the act itself together with all the circumstances including the motive of the wrongdoers and the relations between the parties ..." *Chambers v. Montgomery, supra*, 411 Pa. at 345, 192 A.2d at 358. *See also, Pittsburgh Outdoor Advertising Co. v. Virginia Manor Apartments Inc.*, 436 Pa. 350, 260 A.2d 801 (1970).

396

■ The state of mind of the actor is vital. The act, or the failure to act, must be intentional, reckless or malicious.

The danger here was not an easily perceptible one. While a jury might find that Cedarbrook failed to reasonably perform the duty it undertook, the evidence presented was insufficient to support a finding that they acted with the state of mind necessary to impose punitive damages. While the record indicates that the security systems might have been inadequate under the circumstances, there was no evidence of an evil motive or a reckless indifference to the safety of the tenants.

■ In deciding whether to impose punitive damages a court should not look to the third party's criminal conduct, which in this case was truly outrageous; a court should not look at the end result, which in this case also was outrageous; rather, the court should examine the actor's conduct. As a matter of law, on this record, a jury could not conclude that appellants' conduct was outrageous. Thus the trial court erred in submitting this issue to the jury.

### B. Compensatory Damages

As a result of the trial judge's determination that the issue of punitive damages was a jury question, evidence was allowed concerning appellant's considerable wealth. Cedarbrook argues that this evidence had a prejudicial effect on the jury and thus the compensatory damage award of three million dollars should be vacated. We agree.

■ A jury may not consider a defendant's wealth in setting compensatory damages. It is "improper, irrelevant, prejudicial, and clearly beyond the legally established boundaries." *Trimble v. Merloe*, 413 Pa. 408, 410, 197 A.2d 457, 458 (1964). However, a defendant's wealth is relevant to set punitive damages. *Arye v. Dickstein*, 337 Pa. 471, 474, 12 A.2d 19, 20 (1940).

As we stated earlier, the outrageous conduct necessary to send the issue of punitive damages to the jury was not present in this case. Here, evidence showed that appellant's financial net worth was $40 million. The trial court resisted Cedarbrook's effort to try the issue of punitive damages separately, and refused to deliver Cedarbrook's suggested instruction that consideration of appellant's wealth was not relevant in fixing the amount of compensatory damages. Rather, a broader cautionary instruction was delivered which was inadequate to overcome any prejudice which might have resulted from the introduction of evidence regarding appellant's wealth.

Where the issue of punitive damages incorrectly goes to the jury, and where the trial court fails to sufficiently warn the jury that they may not look to a defendant's wealth in setting compensatory damages, evidence of the wealth of a defendant may improperly prejudice the jury and a compensatory damage award should be set aside.[6]

For the reasons stated above, this case must be remanded to the lower court for a new trial, in accordance with the standards stated.

ZAPPALA, J., joins in this Opinion, and files a separate Concurring Opinion.

LARSEN and PAPADAKOS, JJ., and ROBERTS, Former C.J., did not participate in the decision of this case.

ZAPPALA, Justice, concurring.

We are called upon to decide an issue of first impression—under what circumstances may a landlord be held

---

6. The drastic remedy of a new trial is not required in every case. In some cases a sufficient cautionary instruction may overcome the prejudice triggered by the introduction of evidence of a defendant's wealth.

liable to his tenant for injuries sustained as a result of criminal activity occurring on portions of the leased premises within the landlord's exclusive control. I join in the Opinion of the Court.

Mr. Justice McDermott has admirably resolved a complex case, which was made more difficult by the procedural posture in which the appeal arose. The great majority of appellate courts which have wrestled with this issue have reviewed lower court decisions made at a preliminary stage of the proceedings—such as motions for judgment on the pleadings and summary judgment. Consequently, their review was limited to the question of whether, reading the record most favorably to the plaintiff, a cause of action could be made out. This issue comes to us for the first time following the complete trial.

At the outset I note that I completely subscribe to the Court's treatment of the issues of compensatory and punitive damages set forth in sections II A and II B of the opinion. Because the liability issue has not been addressed previously by this Court, I write separately to explain my understanding of the reasoning which leads to the Court's decision.

The Appellees urge this Court to hold, as did the Superior Court, that a landlord owes a duty—to provide security to protect against criminal acts of third persons—based upon the implied warranty of habitability in residential leases. This approach was adopted in the seminal case of *Kline v. 1500 Massachusetts Avenue Apartment Corp.*, 439 F.2d 477 (D.C.Cir.1970). The United States Court of Appeals for the District of Columbia Circuit recognized that, as a general rule, a private individual does not have a duty to protect another from a criminal attack by a third person. Nevertheless, it concluded that the general rule was inapplicable to the landlord-tenant relationship in multiple dwelling houses. In arriving at its conclusion, the court emphasized the development of the modern view of the lease as a contract,

and the movement away from the traditional analysis of a lease as a conveyance of a property interest. The court stated, "... there is implied in the contract between landlord and tenant an obligation on the landlord to provide those protective measures which are within his reasonable capacity."[1] 439 F.2d at 485.

The landmark Pennsylvania case which reflects the trend towards treating the residential lease as a contract, rather than a conveyance of land for a term, is *Pugh v. Holmes,* 486 Pa. 272, 405 A.2d 897 (1979). There this Court recognized an implied warranty of habitability in residential leases. I would expressly reject the notion advanced by the *Kline* court that a landlord is *required* in the first instance to provide any form of "security service" or protective measures to meet the "warranty of habitability" implied in the lease contract. The central premise of *Pugh v. Holmes* was that the contemporary leasing of residences involves "a well known package of goods and services" and that, therefore, it is proper to give legal protection to the tenant's assumption that a lease guarantees him at least these well known goods and services in exchange for payment of rent. Thus, when we recognized that this package " 'includes not merely walls and ceilings, but also adequate heat, light and ventilation, serviceable plumbing facilities, secure windows and doors, proper sanitation, and proper maintenance,' " 486 Pa. at 282, 405 A.2d at 902, we focused on those qualities which by common understanding constitute the *sine qua non* of "residence". We stated that

[t]he implied warranty is designed to insure that a landlord will provide facilities and services *vital* to the life, health, and safety of the tenant *and to the use of the*

1. In *Kline,* the level of security services which had been provided by the landlord at the inception of the lease had deteriorated. The application of contract principles was, therefore, peculiarly appropriate because of this decline in the protective measures which had been in existence at the time the parties had entered into the lease. The expansive language of the opinion made it apparent, however, that the court would not be inclined to limit liability to those instances in which the level of existing measures had been relaxed.

*premises for residential purposes ...* In order to con- stitute a breach ... [a] defect must be of a nature and kind which will *prevent the use of the dwelling for its intended purpose to provide premises fit for habitation by its dwellers."*

*Id.,* 486 Pa. at 289, 405 A.2d at 905. (Emphasis added). It would be a gross distortion of the reasoning in *Pugh v. Holmes* to give it any part in the analysis of situations such as that presented by the case at bar. Secure doors and windows, that is, devices which serve the purpose for which they were designed and which are not merely holes in walls, are fundamental elements in distinguishing an uninhabitable structure from a residence. "Security services" are not. Only the most fainthearted and seclusive could accept the proposition that lack of such services would render a residence uninhabitable.[2]

Proceeding with the contract analysis, the *Kline* court determined that a duty was owed by a landlord to his tenants simply because the risk of harm existed. The court stated, "... we place the duty of taking protective measures guarding the entire premises and the area peculiarly under the landlord's control against the perpetration of criminal acts upon the landlord, the party to the lease contract who had the effective capacity to perform these necessary acts." 439 F.2d at 482. It is an inaccurate statement of tort law, however, to say that what *may* be

2. The implied warranty/contract analysis must also be rejected for the further reason that the remedies available thereunder are inconsistent with the remedies sought in a tort action such as this. In *Pugh v. Holmes* we noted that where a landlord breaches the implied warranty of habitability, the tenant may a) vacate the premises thereby terminating his obligation to pay rent, b) remain in possession and assert the implied warranty as a defense in an action for unpaid rent, c) make necessary repairs at his own expense and deduct the cost from the amount of rent due, or d) pursue other "traditional" contract remedies such as specific performance. *See generally,* 486 Pa. at 291–95, 405 A.2d at 907–08. Nothing in this discussion even remotely suggests the possibility of a personal injury claim arising out of an alleged breach of the implied warranty of habitability. I cannot countenance the erosion of fundamental distinctions in the law which necessarily results from molding tort remedies to contract analysis.

done, *must* be done.  Duty should not be defined by ability, but by responsibility.

The Appellees suggest that a duty to protect tenants from the risk of criminal conduct is nothing more than a continuation of the landlord's existing duty to maintain the common areas of the leased premises; and that we need not impose a new duty, but merely delineate the scope of an existing obligation.  This existing obligation which the Appellees perceive as the basis for their contention is a landlord's duty to maintain the common areas in a reasonably safe condition for the use of tenants and their invitees.

The term "reasonably safe" has traditionally been interpreted to include physical deficiencies, health hazards, and structural defects.  Liability may be imposed upon a landlord where he had actual notice of a defective condition within the common areas or where a reasonable inspection would have disclosed the condition.  The Appellees would expand "defective condition" to include not only a physical defect, but also a risk of physical harm to tenants from criminal conduct.  The duty of a landlord would be two-fold —i.e., a duty to alleviate an existing condition which creates a risk of harm from criminal conduct *and* a duty to conduct a reasonable investigation to discover such a condition.[3] Liability would then be imposed upon a landlord for a breach of either duty.  This is neither a natural nor a logical extension.

The traditional duty which has been imposed upon a landlord who retains control over the common areas is an exception to the general rule that, absent an agreement to the contrary, a landlord who surrenders possession of the leasehold does not have an obligation to maintain the prem-

3.  The structural soundness of the premises is readily subject to inspection and correction, even in the absence of knowledge of a particular defect.  Without actual notice of criminal activity, however, the protective integrity of the premises, its soundness against the risk of harm from the intentional misconduct of unknown third parties, is not similarly susceptible to meaningful examination.  Possible deficiencies in this regard are infinite, limited only by the imagination.

ises in repair. The exception recognizes that a landlord has exclusive authority to maintain or repair the common areas. I join in the Court's refusal to extend this duty to maintain the common areas to include security services.

As noted in the Opinion of the Court, the weakness of Appellees' argument is demonstrated by their failure to recognize a crucial distinction between the risks of injury from a condition of the property and from criminal acts of a third person. In failing to maintain the condition of the common areas of the leased premises, the landlord's conduct has *created* the risk of injury to a tenant. It is the responsibility of the landlord to abate the risk which his conduct has created. Liability may then be imposed upon a landlord where injury results because of his conduct or failure to remove the risk of harm created by his conduct. The risk of injury from criminal acts arises not from the conduct of the landlord, but from the conduct of a third person.

Where, as here, the conduct of the parties is regulated neither by statute, ordinance, or regulation, nor by the lease-contract itself, the courts have struggled with the issue of whether liability may be imposed upon a landlord for criminal acts.[4] The conflicting resolutions of this issue result from the courts' attempts to respond to what is essentially a social problem, rather than a landlord-tenant problem. The risk of harm from criminal conduct is not peculiar to the landlord-tenant relationship. It is a risk that

4. Unlike Pennsylvania, other jurisdictions have adopted regulations which define the minimum standards for safety in multiple dwellings. For example, the New Jersey legislature has authorized its State Commissioner of Community Affairs to promulgate regulations for the maintenance of multiple dwellings pursuant to the Hotel and Multiple Dwelling Law, N.J.S.A. 55: 13A–1 et seq. In *Trentacost v. Brussel,* 82 N.J. 214, 412 A.2d 436 (1980), the New Jersey Supreme Court relied upon regulations which had been adopted by the Commissioner in holding that a landlord had breached the standard of care in failing to provide a lock on an entrance door. The New Jersey regulation cited therein provided that building entrance doors shall be equipped with heavy duty lock sets.

one encounters in society at large. Any attempt by a landlord to insulate tenants from this risk must necessarily fail. Therefore, the mere fact that a tenant may be exposed to that risk cannot be the basis for imposing liability.

As has been ably detailed in the Opinion of the Court, although the creation of the landlord-tenant relationship in and of itself does not impose a duty on the landlord to provide security services to a tenant, where a landlord voluntarily undertakes to provide protection from criminal acts he has a duty to do so reasonably. Liability is to be imposed only where the measures taken by the landlord either are unreasonable to reduce the risk of harm or have the effect of increasing the risk of harm; or where the landlord fails to maintain the measures which have been adopted in their normal operable condition.

Although it has never been generally accepted that a landlord undertakes an obligation to protect the premises, and the tenant, from the risk of harm from third parties simply by leasing premises to a tenant, Appellees argue that public policy dictates that we now so hold. As this Court stated, however, in *Mamlin v. Genoe*, 340 Pa. 320, 325, 17 A.2d 407, 409 (1941),

[t]he right of a court to declare what is or is not in accord with public policy does not extend to specific economic or social problems which are controversial in nature and capable of solution only as the result of a study of various factors and conditions. It is only when a given policy is so obviously for or against the public health, safety, morals or welfare that there is a virtual unanimity of opinion in regard to it, that a court may constitute itself the voice of the community in so declaring. There must be a positive, well-defined, universal public sentiment, deeply integrated in the customs and beliefs of the people and in their conviction of what is just and right and in the interests of the public weal.