718 A.2d 283

David **STALEY** and Diane Staley, His Wife, Kurt Sturgeon, Edward Boyle, Bonnie Hermansky, Brenda Bennett, Vivian Bennett, Fred Haushalter, Susan Syzmoniak, Wayne Somar, Carol Deluigi, Gordon Somar, David Sturm and Terri Sturm, His Wife, Kerryann Cole, Clayton Best, Mark Salopek and Cynthia Salopek, His Wife, Vince Badamo and Joan Badamo, His Wife, Appellants,

v.

Beatrice **BOURIL** d/b/a Bouril Mobile Home Court, Appellee.

Supreme Court of Pennsylvania.

Submitted March 11, 1998.

Decided Oct. 1, 1998.

Dale J. Gregg, for all appellants.

Beatrice Bouril, pro se.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION

NEWMAN, Justice.

David Staley, et al. (Tenants), residents in a mobile home park owned by Beatrice Bouril[1] (Landlord), appeal from an Order of the Superior Court that affirmed an Order of the Court of Common Pleas of Beaver County (trial court) dismissing their Complaint against the Landlord. The issue in this appeal is whether the implied warranty of habitability applies to the lease of an improved lot in a mobile home park.

---

1. Beatrice Bouril died while this appeal was pending. Her son James Bouril is representing her estate's interest in this appeal.

## FACTUAL AND PROCEDURAL HISTORY

Pursuant to oral month-to-month leases, the Tenants lease improved lots in the Landlord's mobile home park. The lots include a plot of land, and improvements, such as water and septic services, electrical connections, and access to a common roadway. The Tenants own their individual dwelling structures, which are placed on the lots and are connected to the utilities.

In 1989, the Department of Environmental Resources (DER) tested the park's water supply, which came from a well, and found it to be contaminated. DER ordered the Landlord either to connect the mobile home park to the public water supply or to apply for a well permit and comply with certain treatment, sampling, and testing requirements. The Landlord did not comply with DER's order, and the Tenants were forced to seek other sources of water for drinking, cooking, and washing clothes.

On April 26, 1995, the Tenants filed a Complaint in Equity against the Landlord, alleging violations of the implied warranty of habitability. The Tenants sought monetary damages, as well as injunctive relief requiring the Landlord to provide and maintain adequate water and septic services. On May 14, 1996, however, the trial court dismissed the Tenants' Complaint, issuing an Adjudication and Decree Nisi in which the court found that the implied warranty of habitability did not apply to the Tenants' leases of improved lots in the mobile home park. The Tenants filed a Motion for Post–Trial Relief, which the trial court denied, and then appealed to the Superior Court. In a Memorandum Opinion, the Superior Court, without dissent, affirmed the Order of the trial court.

## DISCUSSION

In deciding whether the implied warranty of habitability applies to leases of improved lots in a mobile home park, we begin with our landmark decision in *Pugh v. Holmes*, 486 Pa. 272, 405 A.2d 897 (1979). In *Pugh*, this Court abandoned the doctrine of caveat emptor and adopted the implied warranty of

habitability in residential leases "in order to keep in step with the realities of modern day leasing." *Pugh*, 486 Pa. at 279, 405 A.2d at 900.

*Pugh*'s primary rationale for adopting the implied warranty of habitability is that, "the modern tenant is not interested in land, but rather bargains for a dwelling house suitable for habitation." *Id.* at 282, 405 A.2d at 902. *Pugh* recognizes that, unlike tenants in feudal society to whom "any shelters or structures existing on the land were 'incidental' concerns, ... the modern apartment dweller is a consumer of housing services." *Id.* at 280–82, 405 A.2d at 901–02 (citation omitted). Thus, "[t]he contemporary leasing of residences envisions one person (landlord) exchanging for periodic payments (rent) a bundle of goods and services, rights and obligations." *Id.* at 282, 405 A.2d at 902 (citation omitted). Such goods and services include "not merely walls and ceilings, but also adequate heat, light and ventilation, serviceable plumbing facilities, secure windows and doors, proper sanitation, and proper maintenance." *Id.* (citation omitted).

The Tenants argue, and we do not doubt, that in leasing improved lots in a mobile home park, they bargain for a similar bundle of goods and services. There is no question that potable water, adequate septic service, and proper electrical connections are essential components of a habitable residence. *See, e.g., Elderkin v. Gaster*, 447 Pa. 118, 288 A.2d 771 (1972) (implied warranty of habitability required vendor-builder of new home to provide potable water supply). We also recognize that landlords of mobile home parks, like other landlords, generally have far greater bargaining power than their tenants.

■ The typical residential lease, however, is intended primarily to convey an interest in a residence, such as an apartment or house, and not the land that underlies it. By contrast, the Tenants' lease is intended primarily to convey an interest in a plot of land, albeit with some improvements, and has nothing to do with the dwelling structure that sits on top of it. Thus, while the Tenants are undoubtedly consumers of

some "housing services," such as water, septic, and electrical utilities, the bargain embodied in their lease does not give rise to the same implied warranty of habitability that is present in a typical residential lease. Instead, it gives rise to a limited implied warranty of habitability, the scope of which depends on the particular circumstances of the case.

 Unlike the lease of an apartment, house, or other dwelling structure, which, by operation of law, compels the landlord to provide certain utilities and other essential services, the lease of a lot in a mobile home park does not necessarily oblige the landlord to provide anything more than a plot of ground. Nevertheless, to the extent that the landlord of a mobile home park chooses to provide utilities and other housing services, and charges tenants rent in exchange therefor, the landlord impliedly warrants to maintain the services according to applicable state and local regulations. Like the implied warranty of habitability in a typical residential lease, this limited implied warranty of habitability and the tenant's obligation to pay rent are mutually dependent, so that "a material breach of one of these obligations will relieve the obligation of the other so long as the breach continues." *Pugh*, 486 Pa. at 284, 405 A.2d at 903.

 In applying the limited implied warranty of habitability, courts should follow the guidelines described in *Pugh*. Thus, a breach of the warranty occurs where there is a defect "of a nature and kind which will prevent the use of the [lot] for its intended purpose to provide premises fit for habitation . . . ." *Id.* at 289, 405 A.2d at 905. "Materiality of the breach is a question of fact to be decided by the trier of fact on a case-by-case basis," and depends on such factors as "the existence of [regulatory] violations and the nature, seriousness and duration of the defect." *Id.* at 289, 405 A.2d at 905–06 (citation omitted). "Additionally, . . . a tenant must prove [that] he or she gave notice to the landlord of the defect or condition, that [the landlord] had a reasonable opportunity to make the necessary repairs, and that [the landlord] failed to do so." *Id.* at 290, 405 A.2d at 906 (citation omitted). Reme-

dies for breach of the limited implied warranty of habitability include termination of the obligation to pay rent where the tenant surrenders possession of the premises, rent abatement where the tenant remains in possession, and the "repair and deduct" remedy. *Id.* at 291–97, 405 A.2d at 907–10.

Here, the Superior Court affirmed the trial court's dismissal of the Tenants' Complaint, concluding that, "the implied warranty of habitability does not apply in this context to provide [the Tenants] with the protection or remedies they seek." Superior Court Memorandum Opinion, at 6. We hold that a limited implied warranty of habitability does apply to the Tenants' lease, and therefore disagree with the Superior Court's conclusion. Accordingly, we reverse the Order of the Superior Court and remand the case to the trial court for further proceedings consistent with this Opinion.[2]

ZAPPALA, J., files a dissenting opinion in which CASTILLE, J., joins.

ZAPPALA, Justice, dissenting.

Because I find that the implied warranty of habitability is an inappropriate basis for the relief being sought by the Tenants, I respectfully dissent. The rationale we applied in adopting the implied warranty of habitability in *Pugh v. Holmes*, 486 Pa. 272, 405 A.2d 897 (1979), does not support the majority's decision to expand the implied warranty to include lots in mobile home parks. Also, because the Tenants could proceed under a simple breach of contract claim, it is neither necessary nor prudent for us to recognize a cause of action based on the amorphous concept of a "limited" implied warranty of habitability, which, as the majority recognizes, "leave[s] it to the trial court to determine the scope of the Landlord's limited implied warranty of habitability; the extent, if any, to which the Landlord breached the warranty;

**2.** We leave it to the trial court to determine the scope of the Landlord's limited implied warranty of habitability; the extent, if any, to which the Landlord breached the warranty; whether the Tenants gave the Landlord adequate notice of the problems; and the remedies, if any, to which the Tenants are entitled.

whether the Tenants gave the Landlord adequate notice of the problems; and the remedies, if any, to which the Tenants are entitled." Majority Opinion at 285 n. 2. A traditional breach of contract claim would resolve the dispute expeditiously without implicating such a host of additional issues.

As the majority recognizes, our "primary rationale" for adopting the implied warranty of habitability in *Pugh* was that "the modern tenant is not interested in land, but rather bargains for a dwelling house suitable for habitation." *Id.* at 284 (quoting *Pugh*, at 282, 405 A.2d at 902). My reason for concluding that this rationale does not support the expansion of the implied warranty to include land leased to mobile home owners can hardly be articulated any clearer than through the majority's very own words: "Tenants' lease is intended primarily to convey an interest in a plot of land, albeit with some improvements, *and has nothing to do with the dwelling structure that sits on top of it.*" Majority Op. at 285 (emphasis added).

The Tenants' injuries can be redressed in an action alleging that the Lessor breached its contractual duty to provide the Tenants with the accommodations necessary to adequately maintain their mobile homes on the land that they were leasing. We need not acknowledge a novel basis for recovery such as a "limited" implied warranty of habitability to compensate for the Tenants' failure to pursue such a claim. As Superior Court noted, "the implied warranty of habitability recognizes that 'the modern tenant is not interested in land, but rather bargains for a dwelling house suitable for habitation.... In this case, land, not housing, was the focus of the parties' bargains." Superior Court Memorandum at 4–5 (quoting *Pugh*, at 282, 405 A.2d at 901–902). The only dwellings relevant to this suit are those that were brought by the individual Tenants themselves, and were placed on the plots of land that are the subject matter of the contracts between the Landlord and each individual Tenant. Thus, I would affirm the orders of the lower courts.

CASTILLE, J., joins in the dissenting opinion.