Jared McINTYRE, a Minor, by and through his next friend, Jessie HOWARD, and Jessie Howard in her own right, Appellants,

v.

PHILADELPHIA HOUSING AUTHORITY, Jared McIntyre, a minor, by and through his next friend, Jessie Howard, and Jessie Howard in her own right,

v.

Philadelphia Housing Authority, Appellant.

Commonwealth Court of Pennsylvania.

Argued June 13, 2002.

Decided Jan. 8, 2003.

Reargument and Request for Rehearing En Banc Denied March 13, 2003.

David J. Alexander, Philadelphia, appellant, Howard.

Abbe F. Fletman and Joel M. Sweet, Philadelphia, for appellee, Philadelphia Housing Authority.

BEFORE: COLINS, President Judge,[1] LEADBETTER, Judge, LEAVITT, Judge.

OPINION BY Judge LEAVITT.

Jared McIntyre (McIntyre), a minor, by and through his next friend, Jessie Howard (Howard), and the Philadelphia Housing Authority (PHA), appeal from an order of the Court of Common Pleas of Philadelphia County (trial court) denying their respective motions for post-trial relief. A jury awarded McIntyre damages for personal injuries arising from exposure to lead-based paint in two separate verdicts: the first for PHA's negligence to McIntyre and the second for PHA's breach of the implied warranty of habitability. PHA also appeals the award of delay damages to McIntyre on these two verdicts. We affirm in part and reverse in part.

## FACTUAL AND PROCEDURAL HISTORY

The relevant facts are as follows. Howard began leasing the PHA-owned residence at 847 East Woodlawn Street in Philadelphia (the residence) in 1974. McIntyre was born on March 16, 1993 to Howard's daughter, who also lived at the residence. McIntyre was born healthy, and he experienced normal growth and development during his first year. McIntyre and his mother moved out of the residence in early 1997.

PHA performed lead testing at the residence in August, 1994. On January 4, 1995, it reported to Howard that the tests confirmed the presence of lead paint at the residence. In July, 1996, McIntyre tested

1. This case was originally argued before a panel consisting of Judge Leadbetter, Judge Leavitt and Senior Judge Doyle. As a result of Senior Judge Doyle's retirement from the Court, the case was submitted to President Judge Colins as a member of the panel.

positive for high blood lead levels.[2] In August, 1996, PHA employed AET Environmental to perform a risk assessment at the residence. The risk assessment returned three positive test results for lead paint: a door jamb in the living room, a wall in Howard's bedroom and a wall in the bathroom. According to Howard, McIntyre spent much of his early childhood playing in the living room area on a sheet near the door.

McIntyre, through Howard as his next friend, filed suit against PHA claiming that he suffered injuries as a result of exposure to lead-based paint in the residence. McIntyre asserted four causes of action: (1) negligence; (2) breach of the implied warranty of habitability; (3) civil rights violations under 42 U.S.C. § 1983; and (4) implied rights of action under federal lead-based paint statutes.

Trial began on February 14, 2000, and concluded on March 3, 2000. Joseph Guth, Ph.D., an industrial hygienist trained in the detection and location of hazardous and toxic substances, testified that McIntyre was exposed to lead dust in the living room of the residence. Theodore Lidsky, Ph.D., a behavioral neuroscientist, testified[3] that McIntyre was impaired in four areas: bimanual coordination, visual and auditory attention, visual and verbal memory and concept formation. Reproduced Record 684a (R.R.—). On the issue of medical causation, McIntyre introduced testimony from Paul Shipkin, M.D., a neurologist. Dr. Shipkin testified that "lead intoxication" caused McIntyre's injuries, including his Attention Deficit Disorder (ADD) or Attention Deficit Hyperactivity Disorder (ADHD).[4]

In rebuttal, PHA offered the testimony of Vincent Coluccio, Ph.D., a specialist in environmental health sciences. Dr. Coluccio testified that the results of a wipe test indicated lead dust levels well below the federal standard for toxicity. He emphasized that lead paint exposure is often a consequence of the existence of lead within the general community.[5] PHA also presented David O'Brien, Esq., an attorney and former environmental technician with the lead department of AET Environmental, who conducted the risk assessment at the residence. Mr. O'Brien testified that

---

**2.** McIntyre's blood lead levels peaked at 30 in November, 1996.

**3.** PHA sought to exclude Dr. Lidsky's testimony, alleging that it was based upon a psychological test that Dr. Lidsky administered to McIntyre in violation of the Professional Psychologists Practice Act, Act of March 23, 1976, P.L. 136, *as amended*, 63 P.S. §§ 1201–1218. (PPPA).

**4.** Dr. Shipkin testified as follows:
Q. Doctor, based on your evaluation, your examination of [McIntyre], your review of records, your review of the findings of Drs. Lidsky and Dr. Hoffman, the defense expert, and based on the literature on the effects of lead poisoning on the brains of developing children, do you hold an opinion to a reasonable degree of medical cer-

tainty as to whether lead poisoning was a substantial contributing factor in [McIntyre's] fine motor brain deficits, his attention deficits and attention deficit hyperactivity disorder, his memory deficits and his deficits in concept formation?

\* \* \*

A. I think that with a high degree of medical certainty as the legal profession likes to say or certainly more likely than not, that [it] is highly probable if you will, that the lead intoxication [McIntyre] suffered is in large part if not solely responsible for many of the deficits that you just outlined.
R.R. 1103a–1104a.

**5.** He explained that lead is present in bridges, shipyards and art supplies.

wipe tests were not conducted on any of the carpets at the residence, and that the samples taken from the living room were from the threshold, window sill and window trough. Mr. O'Brien testified that AET considered the residence a low hazard site.

At the close of trial, the jury returned a verdict in favor of McIntyre on the negligence claim and on the breach of the implied warranty of habitability claim. It awarded him $125,000 on each claim, for a total award of $250,000. The jury returned a verdict in favor of PHA on the civil rights and implied rights of action claims.

On March 7, 2000, McIntyre petitioned the trial court for an award of delay damages on the aggregate award. PHA opposed McIntyre's petition on the ground that breach of the implied warranty of habitability is a contract claim and delay damages are not permitted for contract claims. On January 19, 2001, the trial court granted McIntyre's petition and awarded him delay damages in the amount of $22,975.[6]

Both parties filed timely motions for post-trial relief. McIntyre filed motions for a new trial or judgment notwithstanding the verdict on the claim for violation of his civil rights and on the claim to enforce certain federal lead-based paint statutes. PHA requested judgment notwithstanding the verdict or a new trial on the negligence and breach of the implied warranty of habitability claims and/or remittitur. These post-trial motions were denied without hearing on February 28, 2001.

■ Both parties appealed the trial court's order awarding McIntyre delay damages and entering judgment in favor of McIntyre; however, McIntyre has not briefed the issues he appealed.[7] Accordingly, we consider only the issues raised by PHA in its appeal of the trial court's order.[8] PHA contends as follows: (1) neither tort damages nor delay damages can be awarded for breach of the implied warranty of habitability; (2) there is no cause of action for breach of the implied warranty for persons living in property owned by a public housing authority; (3) the jury award for negligence was not supported by sufficient evidence; and (4) Dr. Lidsky should not have been permitted to testify. We address these issues *seriatim.*

## BREACH OF THE IMPLIED WARRANTY OF HABITABILITY AND DELAY DAMAGES

PHA asserts that the trial court erred when it ruled that "actions involving

---

6. The trial court's order of January 19, 2001, granted the petition for delay damages and provided for "a total molded verdict amount of $272,975.00" based upon the "verdict of the jury in the amount of Two Hundred Fifty Thousand Dollars ($250,000.00)." PHA's Brief, Ex. A.

7. In his Statement of Matters Complained of on Appeal and in his Docketing Statement, McIntyre identified numerous errors allegedly made by the trial court. In his briefing before this Court, however, McIntyre merely responds to PHA's arguments. Accordingly, he has waived his cross-appeal. *See, e.g.,*

*Saad v. Sacred Heart Hospital,* 700 A.2d 604, 607 (Pa.Cmwlth.1997) (failing to discuss issues in argument portion of brief constitutes waiver).

8. Our scope of review of an order of a trial court denying motions for post-trial relief is limited to whether the trial court abused its discretion or committed an error of law. *In re Condemnation by Pennsylvania Turnpike Commission of 1.169 Acres in Fee Simple, in Big Beaver Borough, Beaver County,* 745 A.2d 66, 69 n. 8 (Pa.Cmwlth.2000).

breach of the implied warranty of habitability can be brought under tort law, constituting a separate claim from negligence." Trial Court's Opinion at 23. According to PHA, breach of the implied warranty of habitability is a contract claim for which only contract remedies may be awarded. McIntyre, on the other hand, contends that "[a]n injured tenant may recover damages for breach of an implied warranty of habitability for all injuries sustained, whether to his person or his property, if they have been caused by the landlord's breach." McIntyre's Brief at 2. We agree with PHA.

■ The Pennsylvania Supreme Court first recognized a claim for breach of the implied warranty of habitability in *Pugh v. Holmes*, 486 Pa. 272, 405 A.2d 897 (1979).[9] In adopting the implied warranty of habitability, the Supreme Court explained:

> [W]e affirm the Superior Court's holding that *a lease is in the nature of a contract and is to be controlled by principles of contract law*. The covenants and warranties in the lease are mutually dependent; the tenant's obligation to pay rent and the landlord's obligation im-

posed by the implied warranty of habitability to provide and maintain habitable premises are, therefore, dependent and a material breach of one of these obligations will relieve the obligations of the other so long as the breach continues.

*Pugh*, 486 Pa. at 284, 405 A.2d at 903 (emphasis added). Because it was establishing a new cause of action, the *Pugh* court specified "the available remedies and the manner in which these remedies are to be implemented." *Pugh*, 486 Pa. at 291, 405 A.2d at 907. These remedies include: (1) termination of the obligation to pay rent where the tenant surrenders possession of the premises; (2) rent abatement where the tenant remains in possession of the premises; (3) the "repair and deduct" remedy; and (4) *other traditional contract remedies*, such as specific performance.[10] *Pugh*, 486 Pa. at 291–295, 405 A.2d at 907–908.

Almost twenty years later, in *Staley v. Bouril*, 553 Pa. 112, 718 A.2d 283 (1998), the Pennsylvania Supreme Court instructed that "[i]n applying the limited implied warranty of habitability, courts should follow the guidelines described in *Pugh*."[11]

9. To assert a claim for breach of the implied warranty of habitability, a tenant must prove that he or she gave notice to the landlord of the defect or condition, and that the landlord had a reasonable opportunity to make the necessary repairs and failed to do so. *Pugh*, 486 Pa. at 290, 405 A.2d at 906.

10. Specifically, the Supreme Court limited available remedies as follows:

> Where the tenant remains in possession, and the landlord sues for possession for unpaid rent, the implied warranty of habitability may be asserted as a defense.... If the landlord totally breached the implied warranty of habitability, the tenant's obligation to pay rent would be abated in full [and] the action for possession would fail because there would be no unpaid rent. If

the landlord had not breached the warranty at all, no part of the tenant's obligation to pay rent would be abated and the landlord would be entitled to a judgment for possession and for unpaid rent. If there had been a partial breach of the warranty, the obligation to pay rent would be abated in part only. In such case, a judgment for possession must be denied if the tenant agrees to pay that portion of the rent not abated; if the tenant refuses to pay the partial rent due, a judgment granting possession would be ordered.

*Pugh*, 486 Pa. at 292, 405 A.2d at 907 (citations omitted).

11. In *Staley*, the Supreme Court held that the implied warranty of habitability applied to a lease for an improved lot in a mobile home park.

*Staley*, 553 Pa. at 112, 718 A.2d at 285. The *Staley* court reiterated that the remedies available for breach of the implied warranty of habitability "include termination of the obligation to pay rent where the tenant surrenders possession of the premises, rent abatement where the tenant remains in possession, and the 'repair and deduct' remedy." *Id.*

■ In sum, our Supreme Court's rulings in *Pugh* and *Staley* are clear. A landlord's obligation to provide and maintain habitable premises is implicit in residential leases, and because leases are contracts, traditional contract remedies are the only remedies available to enforce the implied warranty of habitability.

Chief Justice Zappala has emphasized the importance of maintaining the distinction between tort and contract remedies in disputes between tenants and landlords. In *Feld v. Merriam*, 506 Pa. 383, 485 A.2d 742 (1984), our Supreme Court considered whether a landlord has a duty to protect tenants from the foreseeable criminal acts of third persons, and if so, under what circumstances. In his concurring opinion, Chief Justice Zappala wrote:

> The implied warranty/contract analysis must also be rejected for the further reason that the remedies available thereunder are inconsistent with the remedies sought in a tort action such as this. In *Pugh v. Holmes* we noted that where a landlord breaches the implied warranty of habitability, the tenant may a) vacate the premises thereby terminating his obligation to pay rent, b) remain in possession and assert the implied warranty as a defense in an action for unpaid rent, c) make necessary repairs at his own expense and deduct the cost from the amount of rent due, or d) pursue other "traditional" contract remedies such as specific performance. *Nothing in [Pugh] even remotely suggests the possibility of a personal injury claim arising out of an alleged breach of the implied warranty of habitability. I cannot countenance the erosion of fundamental distinctions in the law which necessarily results from molding tort remedies to contract analysis.*

*Feld*, 506 Pa. at 400 n. 2, 485 A.2d at 750 n. 2 (Zappala, J., concurring) (emphasis added) (citations omitted).

■ Here, the trial court has ruled as if the erosion between tort and contract, against which Chief Justice Zappala warned, had been completed. In denying PHA's motions for post-trial relief, the trial court stated:

> Courts have also determined that actions involving breach of the implied warranty of habitability can be brought under tort law, constituting a separate claim from negligence. "[O]ur appellate courts have allowed damages for personal injuries to be claimed in negligence actions based on the implied warranty of habitability or otherwise."

Trial Court's Opinion at 23 (citations omitted). The appellate decisions to which the trial court refers are *Rivera v. Selfon Home Repairs & Improvements Co.*, 294 Pa.Super. 41, 439 A.2d 739 (1982), and its progeny, *Asper v. Haffley*, 312 Pa.Super. 424, 458 A.2d 1364 (1983) and *Keck v. Doughman*, 392 Pa.Super. 127, 572 A.2d 724 (1990). Not one of these decisions, however, holds that breach of the implied warranty of habitability is a tort claim for which personal injury damages are recoverable.

*Rivera*, decided before *Staley*, involved an appeal of a trial court's grant of a

defendant landlord's motion for compulsory nonsuit in a *negligence* action.[12] Contrary to McIntyre's assertion, *Rivera* does not teach that breach of the implied warranty of habitability is a tort claim for which personal injury damages may be awarded. Rather, the *Rivera* court merely acknowledged that an implied warranty of habitability will be found to exist in Pennsylvania residential leases, stating that:

> [U]nder the authority of *Pugh* and the Restatement, Second, Property (Landlord and Tenant) § 17.6 (1977),[13] and under the specific and particular facts of the instant case, it was a matter for the fact finder to determine whether or not the landlord was subject to liability for physical harm caused to the plaintiff ... based upon an alleged dangerous condition existing before the tenant had taken possession; further a question for the fact finder as to whether or not the landlord failed to exercise reasonable care to repair the condition and whether or not the existence of the condition was in violation of an implied warranty of habitability.

*Rivera*, 439 A.2d at 743. The Court identifies two separate factual questions: whether a landlord can be held liable for bodily injury and whether a dangerous condition in the property violates the implied warranty of habitability.

Similarly, *Asper*, decided prior to *Staley*, also involved an appeal from a trial court's grant of a defendant landlord's motion for summary judgment on a *negligence* claim.[14] The *Asper* court acknowledged that Pennsylvania adopted the implied warranty of habitability in residential leases in *Pugh*, and held [15] that "in accord with our decision in *Rivera* ... and under the authority of *Pugh* ... and the Restatement of Property (Second) § 17.6 (1977) ... the question of appellee's liability *on a theory of negligence* is a matter for determination by the factfinder." *Asper*, 458 A.2d at 1370 (emphasis added).

Neither *Rivera* nor *Asper* transformed breach of the implied warranty of habitability from a contract claim into a tort claim. Rather, both decisions note that, under Section 17.6 of the Restatement of Property, courts should look to statutory

---

12. Rivera, a tenant, sued her landlord to recover for injuries she allegedly suffered when she fell through the landing at the top of the wooden stairway that provided ingress and egress to her apartment.

13. Section 17.6 provides as follows:
LANDLORD UNDER LEGAL DUTY TO REPAIR DANGEROUS CONDITION.
A landlord is subject to liability for physical harm caused to the tenant and others upon the leased property with the consent of the tenant or his subtenant by a dangerous condition existing before or arising after the tenant has taken possession, if he has failed to exercise reasonable care to repair the condition and the existence of the condition is in violation of:
(1) an implied warranty of habitability; or
(2) a duty created by statute or administrative regulation.

RESTATEMENT (SECOND) OF PROPERTY § 17.6 (1977). To date, this section has not been adopted by the Pennsylvania Supreme Court.

14. Asper, a tenant, brought suit against his landlord to recover for the death of his daughter who died of smoke inhalation in a fire at the leased premises.

15. Judge Wieand wrote in a concurring opinion that he agreed with the majority that the landlord's negligence was an issue for the jury. He then went on to argue that "in his opinion" a landlord's failure to provide safe premises may give rise to liability for the tenant's personal injuries under negligence "and/or" breach of the implied warranty of habitability. *Asper*, 458 A.2d at 1370.

or regulatory duties and the implied warranty of habitability as *standards* for determining whether a landlord has failed to exercise reasonable care to repair a dangerous condition on the leased premises,[16] and, thus, be found negligent. Unlike the present case, neither *Rivera* nor *Asper* involved a claim for breach of the implied warranty of habitability but, rather, a claim for negligence.

The trial court's reliance on *Keck* is also misplaced. In *Keck*, a tenant sued her landlord under theories of negligence and breach of the implied warranty of habitability to recover for injuries she allegedly sustained when she fell in a common area owned by the landlord. The jury returned a verdict for the landlord, finding that the tenant was 58% responsible for her injury. On appeal to the Superior Court, the tenant argued that the trial court erred in charging the jury, effectively precluding her from recovering under the implied warranty of habitability theory. The Court agreed but it declined to order relief because the tenant's contributing negligence exceeded 50%. Judge Wieand, who served on the *Keck* panel, concurred in the result.

After citing the basic elements of a cause of action in negligence, the *Keck* court erroneously stated that "[t]he implied warranty of habitability is a relatively recent development in the law of torts." *Keck*, 572 A.2d at 727. In support, the panel quoted from Judge Wieand's earlier concurring opinion in *Asper*:

> A breach of a landlord's obligation to provide safe and habitable premises gives rise[, in my opinion,] to potential liability under two alternative and separate theories: breach of an implied warranty of habitability and/or conventional negligence ... The injured tenant may recover damages for breach of an implied warranty of habitability for all injuries sustained, whether to his person or to his property, if they have been caused by the landlord's breach ... The injured tenant may also proceed under general principles of tort law, without proving a breach of the implied warranty of habitability, and can recover damages for injuries proximately caused by the landlord's failure to exercise reasonable care to make the premises safe.

*Keck*, 572 A.2d at 727 (citing *Asper*, 458 A.2d at 1370). This language, however, is

---

**16.** The Comments to Section 17.6 confirm this interpretation:

> a. Rationale. Insofar as a duty created by a statute or administrative regulation is concerned, the rule of this section is based on the assumption that the statute or regulation represents a legislative determination of the *standard of conduct* required of the landlord, so that the violation constitutes negligence per se (as to which see §§ 286–288C of the Restatement of the Law, Second, Torts). The tort liability of the landlord in this situation tends to increase the likelihood that the will of the legislature as expressed in the statute or regulation will be effectuated.
>
> Chapter Five of this Restatement takes the position that there is an implied warranty

of habitability by the landlord in regard to residential property. *The implied warranty of habitability is the basis of a duty on the landlord* to maintain the property in a habitable condition. By analogy to the negligence per se doctrine, when the landlord violates this duty, he becomes subject to liability for physical harm resulting from such violation.

> An overriding requirement of the rule of this section is that there be a dangerous condition on the leased property, the existence of which is in violation of either an implied warranty of habitability or a duty created by statute or administrative regulation.

RESTATEMENT (SECOND) OF PROPERTY § 17.6 (1977) (emphasis added).

in direct conflict with *Pugh, Staley* and *Feld.* The *Keck* court itself acknowledged that "[t]here continues to be some confusion regarding the relation between these two theories of recovery." *Keck,* 572 A.2d at 727.

We set that confusion to rest, at least for cases within the jurisdiction of Commonwealth Court. We hold that breach of the implied warranty of habitability [17] is a contract claim for which only contract remedies are available. To hold otherwise would eliminate the fundamental distinctions between contract and tort and only lead to further confusion regarding the nature and role of these two theories of recovery.

As a result of the trial court's error, the jury was improperly permitted to award McIntyre tort damages for a contract claim. Because, by McIntyre's own admission, this action was for bodily injury and "[n]o damages other than damages for bodily injury were sought," McIntyre's Brief at 11, the jury's award for breach of the implied warranty of habitability, [18] as well as the trial court's grant of McIntyre's petition for delay damages [19] with respect to that claim, cannot stand.

## JURY AWARD FOR NEGLIGENCE

■ Next, PHA argues that the trial court erred when it denied its motions for post-trial relief on McIntyre's negligence claim "because there was insufficient competent evidence from which a jury could reasonably conclude that lead exposure at the residence caused McIntyre's injury." PHA's Brief at 28. According to PHA, the testimony of Dr. Shipkin, McIntyre's sole expert witness on medical causation, "was not supported by facts and data, as was required by Pennsylvania Rule of Evidence 705." [20] *Id.* We disagree.

Dr. Shipkin is a board-certified neurologist with the University of Pennsylvania

---

17. Since it was error for the trial court to allow the jury to award tort damages in a breach of contract claim, it goes without saying that delay damages on the breach of the implied warranty claim were improper.

18. Having disposed of McIntyre's claim for breach of the implied warranty of habitability on this ground, we need not address whether the trial court erred when it ruled that the implied warranty of habitability applies to property owned by a public housing authority.

19. Delay damages are awarded pursuant to Pa. R.C.P. No. 238. It provides, in pertinent part:

> (a)(1) At the request of the plaintiff in a civil action seeking monetary relief for bodily injury, death or property damage, damages for delay shall be added to the amount of compensatory damages awarded against each defendant or additional defendant found to be liable to the plaintiff in the verdict of a jury, in the decision of the court in a nonjury trial or in the award of arbitra-

tors appointed under section 7361 of the Judicial Code, 42 Pa.C.S. § 7361, and shall become part of the verdict, decision or award.

Pa. R.C.P. No. 238(a)(1). Even if McIntyre did seek contract damages for breach of the implied warranty of habitability, which he admits he did not, delay damages are not recoverable in contract actions. *See, e.g., Reliance Universal, Inc. of Ohio v. Ernest Renda Contracting Co., Inc.,* 308 Pa.Super. 98, 454 A.2d 39, 44 (1982) (noting that delay damages may only be imposed in tort cases and stating, "[t]he rule makes no provision for recovery of delay damages in contract cases. Indeed, the law is clear that punitive damages are not recoverable in contract actions.").

20. Pa.R.E. 705, Disclosure of facts or data underlying expert opinion, states:

> The expert may testify in terms of opinion or inference and give reasons therefor; however, the expert must testify as to the facts or data on which the opinion or inference is based.

Pa.R.E. 705.

Health System. After conducting a neurological examination of McIntyre, conferring with Howard, consulting a neurologic database called Neurobase, and reviewing McIntyre's medical records, the neurofunctional assessment performed by Dr. Lidsky, the psychological assessment performed by Dr. Hoffman, and the medical literature concerning the effects of lead poisoning on the developing brains of children, Dr. Shipkin opined as follows:

I think that with a high degree of medical certainty as the legal profession likes to say or certainly more likely than not, that [it] is highly probable if you will, that the lead intoxication this child suffered is in large part if not solely responsible for the deficits [identified by Dr. Lidsky].

R.R. 1104a–1105a.

This opinion was supported by facts and data. Dr. Shipkin testified that he was familiar with the medical literature concerning the effects of lead poisoning on the developing brains of children, and that the deficits identified by Dr. Lidsky are "very much consistent" with what the literature says is caused by lead poisoning. R.R. 1102a. Dr. Shipkin further testified that, according to the medical literature, there is a causal relationship between early childhood lead poisoning and ADHD.

Accordingly, we conclude that the trial court did not err in denying PHA's motions for post-trial relief on McIntyre's negligence claim.

### TESTIMONY OF THEODORE LIDSKY, PH.D

■ Finally, PHA argues that Dr. Lidsky was incompetent to testify because his testimony was based upon a psychological test that he administered to McIntyre in violation of the PPPA.[21]

Dr. Lidsky's competency to testify was decided by this Court in *Ford v. Philadelphia Housing Authority*, 789 A.2d 360 (Pa. Cmwlth.2001), *appeal denied,* 569 Pa. 696, 803 A.2d 736 (2002). In *Ford,* we held that, although Dr. Lidsky was not a licensed psychologist, his administration and interpretation of certain tests did not constitute the practice of psychology in violation of the PPPA. *Id.* at 363. "[B]ecause, as neuroscientists, Drs. Lidsky and Dr. Schneider fall within the exception to the necessity of a license provided for in Section 3(3) of the [PPPA], and, therefore, their administration and interpretation of the tests did not violate the [PPPA], the trial court erred in precluding their testimony based solely on that determination." [22] Accordingly, the trial court did not err in allowing Dr. Lidsky to testify.

### CONCLUSION

We reverse the trial court's holding that McIntyre was entitled to tort and delay damages for breach of the implied warranty of habitability. However, we affirm the trial court's order with respect to the sufficiency of evidence on the negligence claim and on the decision to permit Dr. Lidsky to testify.

### *ORDER*

AND NOW, this 8th day of January, 2003, the order of the Court of Common Pleas of Philadelphia County dated Janu-

---

21. 63 P.S. §§ 1201–1218.

22. PHA admits that *Ford* is controlling; it merely sought to preserve the issue pending its appeal of *Ford.* Unbeknownst to PHA, its petition for allowance of appeal in *Ford* was denied two days before it filed its brief in this matter.

ary 19, 2001 in the above-captioned matters is hereby affirmed in part and reversed in part, in accordance with the attached opinion.

Remand for recalculation of delay damages. Jurisdiction relinquished.