J-A22005-19

2019 PA Super 304

| PATRICK PEARSON | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| PHILADELPHIA EAGLES, LLC, EAGLES | : | |
| STADIUM OPERATOR, LLC, AND | : | |
| EXECUTIVE SERVICES MANAGEMENT | : | No. 3053 EDA 2018 |
| INC. | : | |
| | : | |
| Appellants | : | |

Appeal from the Judgment Entered October 4, 2018
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  2016-0800243

BEFORE:   MURRAY, J., STRASSBURGER, J.[*], and PELLEGRINI, J.[*]

OPINION BY MURRAY, J.:                          **FILED OCTOBER 11, 2019**

Philadelphia Eagles, LLC and Eagles Stadium Operator, LLC (collectively, Appellants) appeal from the judgment entered in favor of Appellee Patrick Pearson (Pearson) following a jury trial.  For the reasons that follow, we vacate the judgment, reverse the order denying Appellants' motion for judgment notwithstanding the verdict, and remand for entry of judgment in favor of Appellants.

The trial summarized the facts as follows:

On December 14, 2014, [Pearson], who was a Dallas Cowboys fan, went with his lifelong friend, Stanley Milligan, to the Eagles-Cowboys game.  Notes of Testimony (N.T.) 5/22/18 at 152, 99-100.  The game took place at Lincoln Financial Field, which is managed by [A]ppellants.  Answer to Complaint dated January 9, 2017.  Appellants had entered into a contract with defendant

_____

[*] Retired Senior Judge assigned to the Superior Court.

[Executive Services Management Inc. (Apex)] to provide security for the stadium.

During the game, [Pearson] wore a 5X dark black Dallas Cowboys [Troy Aikman] No. 8 jersey to the Eagles-Dallas Cowboys game in question. [Pearson] and Mr. Milligan watched the game until halftime, when they went to the restroom. Once in the restroom, which was crowded, they got into line to use the urinals. When [Pearson] walked into the bathroom, the Eagles fans were taunting the Cowboys fans, calling them things like "a –hole" and "losers." In response, [Pearson] told the Eagles fans to "get a ring and we'll talk," referring to the winning of a Super Bowl ring. [Pearson] was behind Mr. Milligan in line for the urinal. Once they were close to the urinal, Mr. Milligan heard someone behind him yell, "Shut the F-up." [Pearson] believed this statement was directed towards him, and, when he turned around, he saw a tall, white kid who smelled of alcohol. Mr. Milligan heard the phrase again, uttered closer to him.

Mr. Milligan began using the urinal, during which he heard a scuffle to the side. Someone had walked up to [Pearson], grabbed the Dallas Cowboys knitted cap from [Pearson]'s head and threw it in a urinal near Mr. Milligan. When Mr. Milligan turned to see the cause of the commotion, he no longer saw [Pearson]. [Pearson] testified that the young man who yelled at him had lunged at him, that he put his hands up, and somehow ended up on the floor. Mr. Milligan pushed through the crowd to find [Pearson] surrounded, on the floor, with four or five people holding him down, twisting his leg, and choking him. The man who had said "shut the F-up" may have been underneath [Pearson] at one point during the struggle, though Mr. Milligan did not see him. [Pearson] described one of the men, whom Mr. Milligan grabbed, as an "older white man in his mid 40s." The men attacking [Pearson] ran off when someone yelled "security," or that security was coming. Mr. Milligan and another individual picked [Pearson] up and stood guard. When [Pearson] stood up, he noticed his right foot was turned at a 90-degree angle.

Eventually, a defendant Apex employee, who had been summoned by one of the game attendants, entered the restroom; he asked [Pearson] if he could stand but was unable to locate the attackers. At approximately 10:05 PM, defendant Apex called for medical personnel to be dispatched to the bathroom. Medical personnel was dispatched at 10:07 PM and was on the scene in

the bathroom at 10:09 PM. Security placed [Pearson] in a wheelchair and took him to the security booth where he was treated for a "possible right ankle fracture." Defendant Apex was unable to locate the men who attacked [Pearson]. Defendant Apex did not call the police until 10:20 PM. No defendants ever provided police with any security footage concerning the attack.

[Pearson] was taken to Methodist Hospital via ambulance at 10:37 p.m. He subsequently underwent two surgeries at Einstein Hospital. He had two rods and 10 pins placed in his right leg. After 90 days with a cast on his right leg, [Pearson] underwent physical therapy. He now walks with a limp and has pain in his right leg.

Trial Court Opinion, 3/13/19, at 2-4 (record citations omitted).

On August 2, 2016, Pearson commenced this personal injury action against Appellants and Apex.[1] Following preliminary objections, Pearson filed amended complaints on September 2 and October 11, 2016. Pearson raised allegations of negligence against Appellants and Apex relating to their security program at the stadium, which he claimed caused his injury. On October 21, 2016, Appellants filed an answer with new matter. On December 4, 2017, Appellants filed motions for summary judgment, which the trial court denied on February 1, 2018.

The trial court summarized the remaining procedural history:

On May 25, 2018, following a jury trial before this [c]ourt, the jury returned a verdict for [Pearson.] . . . The jury found that [Appellants'] and [Apex's] negligence were a factual cause of [Pearson]'s harm. Specifically, the jury found that [A]ppellants' causal negligence was 50%, [] Apex's causal negligence was 30%, and [Pearson]'s own causal negligence was 20%. The jury awarded [Pearson] $700,000 in damages.

_____

[1] Apex is not a party to this appeal.

- 3 -

On May 30, 2018, [Pearson] filed a post-trial motion requesting that this [c]ourt grant delay damages against all defendants. On June 4, 2018, [] Apex, as well as [A]ppellants, filed post-trial motions[, including a motion for judgment notwithstanding the verdict].

As to [Pearson]'s motion for delay damages, on June 19, 2018, [A]ppellants filed a response seeking to limit the amount granted to [Pearson] in delay damages, and on June 20, 2018, [] Apex did as well. On July 1, 2018, [Pearson] filed a response in support of seeking greater delay damages from [] Apex, and on July 8, 2018, [Pearson] filed the same response concerning [A]ppellants. On July 11, 2018, this [c]ourt granted [Pearson] delay damages in the amount of $10,897.30 as to [A]ppellants and $6,156.16 as to [] Apex.

As to [A]ppellants' post-trial motions, on June 11, 2018, [Pearson] responded in opposition to [A]ppellants' post-trial motions. On September 28, 2018, this [c]ourt denied [A]ppellants post-trial motions, and judgment was entered accordingly. This timely appeal followed.

*Id.* at 1-2 (footnotes omitted).

On appeal, Appellants present the following issues for review:

A. ARE [APPELLANTS] ENTITLED TO THE ENTRY OF A JUDGMENT N.O.V. DUE TO [PEARSON]'S FAILURE TO MEET HIS BURDEN OF PROVING A DUTY, A BREACH OF ANY DUTY OR THE REQUISITE ELEMENT OF CAUSATION OR, IN THE ALTERNATIVE, ARE [APPELLANTS] ENTITLED TO A NEW TRIAL BASED ON THE WEIGHT OF THE EVIDENCE?

B. ARE [APPELLANTS] ENTITLED TO A NEW TRIAL DUE TO THE TRIAL COURT'S HARMFUL, PREJUDICIAL ERROR IN REFUSING TO ALLOW DEFENSE COUNSEL TO IMPEACH [PEARSON] WITH HIS PRIOR DEPOSITION TESTIMONY CONCERNING THE SUDDEN NATURE OF THE INCIDENT?

C. ARE [APPELLANTS] ENTITLED TO A NEW TRIAL DUE TO THE TRIAL COURT'S HARMFUL, PREJUDICIAL ERROR IN ALLOWING NUMEROUS REFERENCES TO INSURANCE TO BE HEARD BY THE JURY?

D.     ARE [APPELLANTS] ENTITLED TO A NEW TRIAL DUE TO THE TRIAL COURT'S HARMFUL, PREJUDICIAL ERROR IN CHARGING THE JURY WITH STANDARD JURY INSTRUCTION 18.120, AND NOT IN ACCORDANCE WITH THE SUPREME COURT'S DECISION, IN **FELD V. MERRIAM**, OR THIS COURT'S DECISION, IN **REASON V. KATHRYN'S KORNER THRIFT SHOP**, CONCERNING THE DUTY OWED BY [APPELLANTS] TO [PEARSON]?

E.     ARE [APPELLANTS] ENTITLED TO A NEW TRIAL DUE TO THE TRIAL COURT'S HARMFUL, PREJUDICIAL ERROR IN REFUSING TO RULE UPON THE ISSUE OF WHETHER THE JURY WOULD BE CHARGED WITH COMPARATIVE NEGLIGENCE AND WHETHER THE ISSUE WOULD BE SUBMITTED TO THE JURY UNTIL AFTER THE CLOSING ARGUMENTS TOOK PLACE?

Appellants' Brief at 4-5.

For their first issue, Appellants argue that the trial court erred in denying their motion for judgment notwithstanding the verdict (judgment n.o.v. or JNOV).  We recognize the following standard of review:

We will reverse a trial court's grant or denial of a judgment notwithstanding the verdict only when we find an abuse of discretion or an error of law that controlled the outcome of the case.  Further, the standard of review for an appellate court is the same as that for a trial court.

There are two bases upon which a judgment [notwithstanding the verdict] can be entered; one, the movant is entitled to judgment as a matter of law and/or two, the evidence is such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant.  With the first, the court reviews the record and concludes that, even with all factual inferences decided adverse to the movant, the law nonetheless requires a verdict in his favor.  Whereas with the second, the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure.

*United Envtl. Grp., Inc. v. GKK McKnight, LP*, 176 A.3d 946, 959 (Pa. Super. 2017) (quoting *Shiflett v. Lehigh Valley Health Network, Inc.*, 174 A.3d 1066, 1081 (Pa. Super. 2017)).

Appellants assert that they are entitled to judgment notwithstanding the verdict based on their contention that Pearson "failed to set forth a *prima facie* case of negligence against [Appellants]." Appellants' Brief at 17. Specifically, Appellants contend that Pearson failed to prove that Appellants were negligent in implementing their security program and thus, Pearson could not demonstrate that Appellants breached a duty that caused his injury.

In any case alleging negligence, the plaintiff has the burden to prove the following four elements: "1. [a] duty or obligation recognized by law[,] 2.[a] breach of the duty[,] 3. [c]ausal connection between the actor's breach of the duty and the resulting injury[, and] 4. [a]ctual loss or damage suffered by complainant." *Wilson v. PECO Energy Co.*, 61 A.3d 229, 232 (Pa. Super. 2012) (quoting *Cooper v. Frankford Health Care System, Inc.*, 960 A.2d 134, 140 n.2 (Pa. Super. 2008) (citation omitted). "[I]t is incumbent on a plaintiff to establish a causal connection between defendant's conduct, and it must be shown to have been the proximate cause of plaintiff's injury." *Lux v. Gerald E. Ort Trucking, Inc.*, 887 A.2d 1281, 1286 (Pa. Super. 2005) (quotations and citation omitted).

"The duty owed to a business invitee is the highest duty owed to any entrant upon land. The landowner is under an affirmative duty to protect a

business visitor not only against known dangers but also against those which might be discovered with reasonable care." ***Truax v. Roulhac***, 126 A.3d 991, 997 (Pa. Super. 2015) (*en banc*) (quotations and citation omitted). This Court has explained:

> In determining the scope of duty property owners owe to business invitees, we have relied on Restatement (Second) of Torts § 343, which provides:
>
> > A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land, if but only if, he:
> >
> > (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk to such invitees, and
> >
> > (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
> >
> > (c) fails to exercise reasonable care to protect them against the danger.
>
> ***See Neve v. Insalaco's***, 771 A.2d 786, 790 (Pa. Super. 2001) (quoting Restatement (Second) of Torts § 343).
>
> An invitee must demonstrate that the proprietor deviated from its duty of reasonable care owed under the circumstances. ***Id.*** at 791. Thus, the particular duty owed to a business invitee must be determined on a case-by-case basis. . . .

***Campisi v. Acme Markets, Inc.***, 915 A.2d 117, 119-20 (Pa. Super. 2006) (some citations omitted).

Appellants argue that the trial court erred in concluding that they deviated from the duty of reasonable care owed to Pearson under the circumstances by not having security personnel stationed in the stadium

- 7 -

restrooms on the basis that it was foreseeable that altercations could take place in the bathrooms. Appellants assert, "[t]he mere fact that there was not a guard placed in the bathrooms to monitor the patrons in no way established any negligence with regard to the program of security actually offered." Appellants' Brief at 21. Appellants contend that Pearson "cannot meet his burden of proving negligence by claiming that he would not have been injured if a different program of security was provided, *i.e.*, an extra security guard stationed **inside** the bathroom." **Id.** (emphasis in original).

In support of this argument, Appellants rely on our Supreme Court's decision in **Feld v. Merriam**, 485 A.2d 742 (Pa. 1984). In **Feld**, the plaintiffs had just returned to their assigned parking space in the parking garage of their apartment complex when three armed individuals assaulted them and held them at gunpoint. **Id.** at 744. The plaintiffs sued the owners of the apartment complex, "alleging a duty of protection owed by the landlord, the breach of the duty, and injuries resulting therefrom." **Id.** at 744-45. The jury returned a verdict in favor of the plaintiffs and this Court affirmed. **Id.**

On appeal to the Supreme Court, "[t]he threshold question is whether a landlord has any duty to protect tenants from the foreseeable criminal acts of third persons, and if so, under what circumstances." **Id.** at 745. The Court began its analysis by acknowledging the following:

> Well settled law holds landlords to a duty to protect tenants from injury rising out of their negligent failure to maintain their premises in a safe condition. **See Smith v. M.P.W. Realty Co. Inc.**, 225 A.2d 227 (Pa. 1967); **Lopez v. Gukenback**, 137 A.2d

771 (Pa. 1958). That rule of law is addressed to their failure of reasonable care, a failure of care caused by their own negligence, a condition, the cause of which was either known or knowable by reasonable precaution. The criminal acts of a third person belong to a different category and can bear no analogy to the unfixed radiator, unlighted steps, falling ceiling, or the other myriad possibilities of one's personal negligence. To render one liable for the deliberate criminal acts of unknown third persons can only be a judicial rule for given limited circumstances.

The closest analogy is the duty of owners of land who hold their property open to the public for business purposes. *See Leary v. Lawrence Sales Corp.*, 275 A.2d 32 (Pa. 1971). They are subject to liability for the accidental, negligent or intentionally harmful acts of third persons, as are common carriers, innkeepers and other owners of places of public resort. Section 344, comment (f) of the Restatement (Second) of Torts, adopted by this [C]ourt in *Moran v. Valley Forge Drive-In Theater, Inc.*, 246 A.2d 875 (Pa. 1968), requires that they take reasonable precaution against that which might be reasonably anticipated. The reason is clear; places to which the general public are invited might indeed anticipate, either from common experience or known fact, that places of general public resort are also places where what men can do, they might. One who invites all may reasonably expect that all might not behave, and bears responsibility for injury that follows the absence of reasonable precaution against that common expectation. The common areas of an apartment complex are not open to the public, nor are the general public expected or invited to gather there for other purposes than to visit tenants.

*Id.* (citations modified).

Recognizing that "there is a general rule against holding a person liable for the criminal conduct of another absent a preexisting duty," the Court explained that "there is also an exception to that rule, *i.e.*, where a party assumes a duty, whether gratuitously or for consideration, and so negligently performs that duty that another suffers damage." *Id.* (citing *Pascarella v. Kelley*, 105 A.2d 70 (Pa. 1954)). The Court explained:

- 9 -

This exception has been capsulized in Section 323 of the Restatement (Second) of Torts, which provides:

§ 323. Negligent Performance of Undertaking to Render Services

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking.

Previously we adopted this section as an accurate statement of the law in this Commonwealth. *Gradel v. Inouye*, 421 A.2d 674 (Pa. 1980); *DeJesus v. Liberty Mut. Ins. Co.*, 223 A.2d 849 (Pa. 1966).

Expounding on the proper application of Section 323 the drafters indicated that

[T]his Section applies to any undertaking to render services to another which the defendant should recognize as necessary for the protection of the other's person or things. It applies whether the harm to other or his things results from the defendant's negligent conduct in the manner of his performance of the undertaking, or from his failure to exercise reasonable care to complete it or to protect the other when he discontinues it.

Comment (a) § 323 Restatement (Second) of Torts. These comments are particularly relevant in a situation such as the present where a landlord undertakes to secure the areas within his control and possibly fosters a reliance by his tenants on his efforts.

Absent therefore an agreement wherein the landlord offers or voluntarily proffers a program, we find no general duty of a

landlord to protect tenants against criminal intrusion. However, a landlord may, as indicated, incur a duty voluntarily or by specific agreement if to attract or keep tenants he provides a program of security. A program of security is not the usual and normal precautions that a reasonable home owner would employ to protect his property. It is, as in the case before us, an extra precaution, such as personnel specifically charged to patrol and protect the premises. Personnel charged with such protection may be expected to perform their duties with the usual reasonable care required under standard tort law for ordinary negligence. When a landlord by agreement or voluntarily offers a program to protect the premises, he must perform the task in a reasonable manner and where a harm follows a reasonable expectation of that harm, he is liable. The duty is one of reasonable care under the circumstances. It is not the duty of an insurer and a landlord is not liable unless his failure is the proximate cause of the harm.

A tenant may rely upon a program of protection only within the reasonable expectations of the program. **He cannot expect that a landlord will defeat all the designs of felonry**. He can expect, however, that the program will be reasonably pursued and not fail due to its negligent exercise. If a landlord offers protection during certain periods of the day or night a tenant can only expect reasonable protection during the periods offered. If, however, during the periods offered, the protection fails by a lack of reasonable care, and that lack is the proximate cause of the injury, the landlord can be held liable. A tenant may not expect more than is offered. If, for instance, one guard is offered, he cannot expect the same quality and type of protection that two guards would have provided, nor may he expect the benefits that a different program might have provided. He can only expect the benefits reasonably expected of the program as offered and that that program will be conducted with reasonable care.

*Feld v. Merriam*, 485 A.2d at 746-47 (emphasis added, citations modified, footnotes omitted).

Instantly, while there is no dispute that Pearson was a business invitee or that Appellants voluntarily undertook a duty protect its invitees from

fighting during football games at Lincoln Financial Field,[2] Appellants maintain that **Feld** precluded their liability for Pearson's injuries merely because they did not have security personnel stationed in their restrooms, when the security program they had in place was otherwise adequate and Pearson presented no evidence that they operated it in a negligent manner. We agree.[3]

_____

[2] Lincoln Financial Field's "Code of Conduct," in the handbook available to all guests who enter the premises, explicitly states:

> Lincoln Financial Field is committed to creating a safe, comfortable and enjoyable experience for our guests, both inside the stadium and throughout our parking areas. Our staff will proactively support an environment free from the following behaviors:
>
> - Abusive, foul or disruptive language and obscene gestures.
> - Intoxication or other signs of impairment related to alcohol consumption or other drug use
> - Fighting, taunting or threatening remarks or gestures.
> - Sitting in a location other than the guest's ticketed seat.
> - Displays of affection not appropriate in a public setting.
> - Obscene or indecent clothing.
> - Any disruption to the progress of the event by guests' actions.
> - Any behavior which otherwise interferes with other guests' enjoyment of the game.

Plaintiff's Exhibit P-7; [Pearson's] Answer in Opposition to [Appellants'] Motion for Summary Judgment, 12/17/17, Exhibit C ("Code of Conduct"). Thus, as the Code of Conduct indicates, Appellants undertook to protect their guests from "[f]ighting, taunting or threatening remarks or gestures." **Id.**

[3] Although the trial court rejected the application of **Feld** because this case is not a landlord-tenant case, we note that this Court has previously applied **Feld** outside of the landlord-tenant context. **See Kerns v. Methodist Hosp.**, 574 A.2d 1068, 1075-78 (Pa. Super. 1990) (applying **Feld** to address the plaintiff's claim that the security program for the protection of staff, patients, and visitors implemented by a hospital was inadequate).

This Court has explained that, pursuant to Comment *f.* to Section 344 of the Restatement (Second) of Torts, the duty to protect business invitees against third party conduct arises only if the owner has reason to anticipate such conduct. ***Reason v. Kathryn's Korner Thrift Shop***, 169 A.3d 96, 102 (Pa. Super. 2017) (citing ***Truax***, 126 A.3d at 997-98). Comment *f.* states:

> *f. Duty to police premises.* Since the possessor is not an insurer of the visitor's safety, he is ordinarily under no duty to exercise any care until he knows or has reason to know that the acts of the third person are occurring, or are about to occur. He may, however, know or have reason to know, from past experience, that there is a likelihood of conduct on the part of third persons in general which is likely to endanger the safety of the visitor, even though he has no reason to expect it on the part of any particular individual. If the place or character of his business, or his past experience, is such that he should reasonably anticipate careless or criminal conduct on the part of third persons, either generally or at some particular time, he may be under a duty to take precautions against it, and to provide a reasonably sufficient number of servants to afford a reasonable protection.

Restatement (Second) of Torts § 344, Comment *f.*

Thus, the appropriate inquiry in this case is first whether Appellants had notice of prior incidents in the stadium bathrooms. ***See Reason***, 169 A.3d at 102; Restatement (Second) of Torts § 344, Comment *f.* If no such notice existed, then Pearson had to demonstrate that Appellants otherwise lacked reasonable care in conducting their security program. ***See Feld***, 485 A.2d at 745-47.

Appellants argue that they had no notice that a violent attack like the one on Pearson was likely to occur. Appellants maintain that the attack on Pearson was a surprise and that there is no evidence of record that supports

the trial court's conclusion that Appellants were aware of multiple prior incidents of violence in the stadium's bathrooms. In response, Pearson asserts that Appellants were on notice that the stadium restrooms were a dangerous location because Brian Beppel (Beppel), an Apex employee, and James Hayslip (Hayslip), Appellants' Director of Facility Security, both explicitly testified at trial that they were aware that fights had occurred in restrooms. Pearson's Brief at 17-18 ("Despite knowing there were fights in the restrooms, the Eagles now contend that they had no notice of prior acts of fighting.").

The record, however, belies Pearson's assertions. While Beppel and Hayslip acknowledged in their trial testimony that in the past, fights had occurred in the restrooms, both explained that these incidents occurred with such infrequency, that Appellants chose to have their security personnel more closely monitor other areas of the stadium. N.T., 5/21/18 (Volume 1), at 86-89, 94-95; N.T., 5/22/18 (Volume 2), at 20-21, 23-24.

Significantly, Hayslip testified:

Q. And it is not [Appellants'] policy, is it, to post someone in the restroom?

A. It is not.

Q. How about posting outside the restroom?

A. No, sir.

Q. Why not? Why don't they want to post somebody there?

A. Historically, we've had no issues in the restrooms. I've been in that stadium since 2004, and, historically, we've had no issues inside the restrooms.

Q. Are you going to sit here, Mr. Hayslip, and say since 2004 – you've been with [Appellants] now 14 years -- that in all those 14 years, you've never had a fight or disturbance in the restroom?

A. I'm not saying that, sir. What I'm saying is it's not something to the point that we need to concern [*sic*] to put staff in there. Our staff -- our concerns are in other places, not the restrooms.

Q. Why not?

A. There's no data that reports that we have issues in the restroom.

Q. I thought I just gave you an example.

A. That's one example in 12 years.

                    *        *        *

Q. Was the decision cost not to post a security guard outside the restroom?

A. No. As I said, it's a situational deployment is what we call it, meaning there's no -- you can also reference what's called a hot sheet, where if we have incidents over a period of time in multiple locations, we see there's a trend, we will put staff. It could be undercover. It could be somebody you don't know is a staff person. We would change our deployment in order to manage that. The bathrooms don't show that we've had historical data where we need to put some sort of staff in those locations. So no, sir.

                    *        *        *

[Q.] [I]f [Appellants] are aware that fans can be subject to physical violence, why do they not put anybody outside the restrooms?

A. Again, I told you there's a method to our madness, and our methodology is that we go where the incidents are. We have staff

- 15 -

outside the building in order to get the guests in, 70,000 guests. Once they're inside, we strategically place them throughout the building where we know the incidents are. Where the incidents are, not inside the bathrooms.

Q. But did you say in your 14 years, you are aware of fighting in the bathrooms?

A. Yes, there have been altercations in the bathroom.

Q. And it's not just the men's bathroom, right? It's in the women's bathroom, too?

A. Altercations?

Q. Yes.

A. I can't recall any in the women's bathrooms. Doesn't mean that they don't exist. But, again, that's in general, we just don't have a lot of incidents in the bathrooms.

N.T., 5/21/18 (Volume 1), at 86-89, 94-95.

Similarly, Beppel testified to the following:

Q. Have [Appellants] or anyone asked you to deploy any of your Apex personnel to be stationed outside a restroom?

A. No. It's part of their patrolling area, you know, . . . . So they do go in there, but it's not at any set time or schedule or, you know, check when we would go in there.

Q. Okay. And in the 14 years or so that you've been employed at Lincoln Financial Field, are you aware of any disturbances or incidences in the restroom.

A. It's pretty rare. Maybe some unconscious folks, you know, here or there. But it's pretty rare to have a violent incident inside of a restroom.

Q. Why is it rare?

A. It just didn't happen that frequently.

Q.  How about in 2014?  Did it happen?

A.  Yes.

Q.  Well –

A.  With the plaintiff.

Q.  Well, other than Mr. Pearson, are you aware of any restroom incidences in 2014 during any of the home games?

*     *     *

Q.  What I was asking you, Mr. Beppel, was to take a look at what was Nos. 210 through 212.

A.  Yes.

Q.  All right.  And they appear to me to be incidences in the restrooms.

A.  Yeah.  Well, it's exactly what I said, that there's intoxicated persons.  So we do find a lot of intoxicated persons in the restrooms, but violent incidents along the lines of assaults that led to broken bones, those are rare.

Q.  Right.  I wasn't talking just about assaults.  I'm asking you did you have knowledge of any -- I use the term "incidences."  Are there any problems?

A.  And I said that, yeah, we tend to get a lot of intoxicated persons in the restroom, which is recorded by the log.

Q.  Doesn't that concern you then?

A.  No.

Q.  You're not concerned to have a lot of intoxicated persons in the restrooms?

A.  No.  We go in and address them.

Q.  Doesn't that lead to trouble, sir?

A. Not necessarily. It's usually -- sometimes it's an issue for the guest that's actually intoxicated. They're overimpaired, they can't stand, can't follow directions. We remove them or get them to the medical attention that they might need.

N.T., 5/22/18 (Volume 2), at 20-21, 23-24.

Based on the testimony of Hayslip and Beppel, the record, at most, indicates that Appellants were on notice that there were persons who became incapacitated because of intoxication in the stadium restrooms. *See* N.T., 5/21/18 (Volume 1), at 86-89, 94-95; N.T., 5/22/18 (Volume 2), at 20-21, 23-24. The record in no manner supports the trial court's determination or Pearson's assertion that there was a history of violent assaults that occurred in the restrooms. *See id.* To the contrary, the record shows that incidents of violent assaults or fighting in the restrooms were a rare occurrence. *See id.* Based upon our review of the record, there is no evidence that Appellants knew or had reason to know, from past experience, that violent assaults were likely to occur in the restrooms that would endanger Appellants' invitees. Therefore, under Comment *f.* to Section 344 of the Restatement (Second) of Torts, Appellants did not act unreasonably by not stationing security personnel in or directly outside the stadium restrooms. *See* Restatement (Second) of Torts § 344, Comment *f.*

Consequently, at best, Pearson can argue that Appellants should have had in place a different security program or additional security personnel available on the night of Pearson's injury. Such an argument, however, is not a basis for a finding of negligence under *Feld*. *See Feld*, 485 A.2d at 745-

47.   Pursuant to **_Feld_**, in order to successfully prove a negligence claim, Pearson had to demonstrate that the Appellants failed to conduct the security program offered with "reasonable care."   **_See id._**

Appellants argue that there is no evidence of record indicating that they lacked reasonable care in operating their security program.  Pearson points to his testimony at trial and the testimony of Milligan indicating that it took several minutes for security personnel to arrive at the restroom following the altercation that resulted in Pearson's injury.  Even assuming this testimony to be accurate, it provides no support for Pearson's claim that Appellants negligently operated their security, as there is no indication in the record or otherwise that had the security personnel been more prompt in arriving at the restroom, it would have prevented Pearson's injury.

Pearson also points to the fact that it was a known danger to wear the apparel of the opposing team to Eagles' games as proof that Appellants operated their security program in a negligent manner.  This argument is unavailing, as Appellants both recognized this danger and addressed the issue by having some of their security personnel dress in the opposing team's apparel at their games, and patrol the stadium undercover to identify individuals who were harassing fans of the opposing team.  **_See_** N.T., 5/22/18 (Volume 2), at 25-26.

In sum, **_Feld_** instructs that property owners are liable to business invitees for harm caused by the foreseeable criminal actions of third parties

only if the property owner agreed to undertake or voluntarily undertook a duty to provide such protection. *Id.* at 745-46. In such situations, an invitee "can only expect the benefits reasonably expected of the program as offered and that that program will be conducted with reasonable care." *Id.* at 747. Where a property owner knows or has reason to know, from past experience, that there is a likelihood of conduct on the part of third persons that would harm invitees, the property owner "may be under a duty to take precautions against it, and to provide a reasonably sufficient number of servants to afford a reasonable protection." Restatement (Second) of Torts § 344, Comment *f.* In this case, however, the record does not support the trial court's conclusion that Appellants were on notice that violent assaults regularly took place in the stadium's restrooms or that Appellants conducted their security program without reasonable care.

Therefore, we conclude that the trial court erred in denying Appellants motion for judgment notwithstanding the verdict, as Appellants were entitled to judgment as a matter of law. *See United Envtl.*, 176 A.3d at 959. Accordingly, we vacate the judgment entered in favor of Pearson, reverse the order denying Appellants' motion for judgment notwithstanding the verdict,

and remand this matter to the trial court for entry of judgment in favor of Appellants.[4]

Judgment vacated. Order reversed. Case remanded. Jurisdiction relinquished.


Judge Pellegrini joins the Opinion.

Judge Strassburger files a Concurring Opinion in which Judge Pellegrini joins.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>10/11/19</u>

---

[4] Because we are vacating the judgment and reversing the order denying the motion for judgment notwithstanding the verdict based on Appellants' first issue, we need not address Appellants' remaining issues.