J-S09013-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| JASON BORTH AND JEFFREY BORTH, CO-ADMINISTRATORS OF THE ESTATE OF PATRICIA BORTH, DECEASED | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellant | : | |
| | : | |
| v. | : | No. 2044 EDA 2022 |
| | : | |
| ALPHA CENTURY SECURITY, INC., RITE AID OF PENNSYLVANIA, INC., SECURITY RESOURCES INTERNATIONAL, INC., SECURITY RESOURCES OF PA, INC D/B/A HONOR GUARD SECURITY | : | |
| v. | : | |

ALBERT GERGER

Appeal from the Orders Entered July 20, 2022
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s): 180105092

BEFORE:   LAZARUS, P.J., BECK, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY LAZARUS, P.J.:                 **FILED AUGUST 1, 2025**

_____

[*] Former Justice specially assigned to the Superior Court.

Jason Borth and Jeffrey Borth (the Borths), Co-Administrators of the Estate of Patricia Borth, Deceased,[1] appeal from the orders[2] granting Alpha Century Security, Inc. (Alpha Century), and Security Resources, Inc. (SRI) (collectively, Security Defendants), and Rite Aid of Pennsylvania, Inc. (Rite Aid) (collectively, Defendants) joint motion for summary judgment. After our review, we reverse.

The trial court set forth the factual and procedural history as follows:

On December 16, 2017, Patricia Borth was brutally beaten and robbed 734 feet away from the Rite Aid store, located at 136 North 63rd Street in Philadelphia, where she encountered Albert Geiger[1] [Geiger], her attacker.

Rite Aid and Alpha [Century] pleaded in [Defendants' m]otion for [s]ummary [j]udgment that Rite Aid security tapes reveal that [] Geiger initiated conversation with Ms. Borth while inside the store, appeared to follow her around, and that Ms. Borth purchased something and received cash back at the register while Mr. Geiger exited the store without purchasing anything. Ms. Borth paused by security guard Deion Perkins [Guard Perkins] of Alpha Century [] for twelve seconds before leaving the store.[2] In deposition testimony, Ms. Borth stated that [] Geiger asked her how she was doing while she was in the store and that she noticed him near her, but she was not sure what he was doing and that she was not afraid or fearful at any point while she was in Rite Aid, or upon her exit from the store.

_____

[1] Plaintiff Patricia Borth died while this lawsuit was pending. Her administrators, the Borths, have been substituted as Appellants in this appeal on her behalf.

[2] The court entered two orders, one granting summary judgment with respect to Plaintiff's amended complaint, and one granting summary judgment with respect to punitive damages. Both orders are dated July 20, 2022, and both orders are identified by the same docket number and case identification number.

Once [he was] a city block away from Rite Aid, [] Geiger testified that he decided to attack and rob Ms. Borth, causing her to suffer a closed facial fracture[,] that required surgery to repair[,] and a scalp laceration. Ms. Borth initiated this action against the above-named Defendants by praecipe on January 30, 2018 and filed a complaint on March 9, 2018[,] raising claims of negligence against Rite Aid, Alpha Century[, the company that hired security guard Perkins] and [SRI ]. On May 3, 2018, an amended complaint was filed. On May 17, 2018, Rite Aid joined [] Geiger (incorrectly named as [] Gerger) as an additional defendant. On February 7, 2022, Defendant[s] Rite Aid, Alpha Century [] and [SRI] filed a joint motion for summary judgment.

> [1]The parties previously believed Albert Geiger's last name was Gerger. Plaintiff noted that his proper name is Albert Geiger.

> [2] In Pennsylvania, Rite Aid utilizes services of independent contractors as agency guards through [SRI]. On the date of Plaintiff's attack, [SRI] subcontracted with Alpha Century [] to provide asset protection. [Guard] Perkins was the Alpha [C]entury [] employee assigned to Rite Aid the day of Ms. Borth's attack.

Trial Court Opinion, 12/8/22, at 1-2.

On February 7, 2022, the trial court granted Defendants' motion for summary judgment. The Borths filed a timely notice of appeal. Both the Borths and the trial court have complied with Pa.R.A.P. 1925.

On appeal, the Borths raise the following issues:

1. Whether the trial court erred by entering summary judgment for Defendants based on the finding that the attack of Ms. Borth was unforeseeable as a matter of law?

2. Whether the trial court erred by entering summary judgment for Defendants based on the finding that their duty to protect Ms. Borth was extinguished when she left the store's premises?

3. Whether the trial court erred by entering summary judgment for Defendants where assailant Geiger's attack

was not a superseding cause and the record in this case establishes that, at the very least, there is an issue of material fact that Defendants owed Ms. Borth a duty and acted negligently in performing such duty, which resulted in substantial harm to Ms. Borth?

4. Whether the trial court erred by dismissing Ms. Borth's claim for punitive damages, where the trial court should not have entered summary judgment against her, and there is a genuine issue of fact as to whether Defendants' conduct was outrageous and reckless?

5. Whether the trial court erred by dismissing Ms. Borth's claims when it had been divested of subject matter jurisdiction at the time it entered the orders on appeal, because [Ms. Borth] had died and a personal representative had not yet been appointed?

Appellants' Brief, at 10-11 (unnecessary capitalization and punctuation omitted).

Our standard of review of an appeal from an order granting summary judgment is well settled: Summary judgment may be granted only in the clearest of cases where the record shows that there are no genuine issues of material fact and also demonstrates that the moving party is entitled to judgment as a matter of law. Whether there is a genuine issue of material fact is a question of law, and therefore our standard of review is de novo and our scope of review is plenary. When reviewing a grant of summary judgment, we must examine the record in a light most favorable to the non-moving party.

*Newell v. Montana West, Inc.*, 154 A.3d 819, 821–22 (Pa. Super. 2017) (citations and internal quotation marks omitted).

After the relevant pleadings are closed, but within such time as not to unreasonably delay trial, any party may move for summary judgment[,] in whole or in part[,] as a matter of law

(1) whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense

- 4 -

which could be established by additional discovery or expert report, or

(2) if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury.

Pa.R.C.P. 1035.2. **See Babb v. Ctr. Cmty. Hosp.**, 47 A.3d 1214, 1223 (Pa. Super. 2012) ("Where the non-moving party bears the burden of proof on an issue, he may not merely rely on his pleadings or answers in order to survive summary judgment."). Further, "[f]ailure of a non-moving party to adduce sufficient evidence on an issue essential to his case and on which he bears the burden of proof establishes the entitlement of the moving party to judgment as a matter of law." **Id.**

Thus, our responsibility as an appellate court is to determine **whether the record either establishes that the material facts are undisputed or contains insufficient evidence of facts to make out a prima facie cause of action, such that there is no issue to be decided by the fact-finder.** If there is evidence that would allow a fact-finder to render a verdict in favor of the non-moving party, then summary judgment should be denied.

**Id.**, quoting **Reeser v. NGK N. Am., Inc.**, 14 A.3d 896, 898 (Pa. Super.2011) (citations omitted) (emphasis added).

In cases alleging negligence, the plaintiff has the burden to prove the following four elements: "1. [a] duty or obligation recognized by law[,] 2. [a] breach of the duty[,] 3. [a c]ausal connection between the actor's breach of the duty and the resulting injury[, and] 4. [a]ctual loss or damage suffered

- 5 -

by complainant." ***Wilson v. PECO Energy Co.***, 61 A.3d 229, 232 (Pa. Super. 2012) (quoting ***Cooper v. Frankford Health Care System, Inc.***, 960 A.2d 134, 140 n.2 (Pa. Super. 2008) (citation omitted). "[I]t is incumbent on a plaintiff to establish a causal connection between defendant's conduct [and plaintiff's injury], and it must be shown to have been the proximate cause of plaintiff's injury." ***Lux v. Gerald E. Ort Trucking, Inc.***, 887 A.2d 1281, 1286 (Pa. Super. 2005) (quotations and citation omitted). "[W]here the evidence is such that a jury would have to reach a verdict on the basis of speculation or conjecture[,]" a court must grant summary judgment. ***InfoSAGE, Inc. v. Mellon Ventures, L.P.***, 896 A.2d 616, 632 n.12 (Pa. Super. 2006) (citing ***Cade v. McDanel***, 679 A.2d 1266, 1271 (Pa. Super. 1996)).

We further recognize that "[t]he duty owed to a business invitee is the highest duty owed to any entrant upon land. The landowner is under an **affirmative duty to protect a business visitor not only against known dangers but also against those which might be discovered with reasonable care**." ***Truax v. Roulhac***, 126 A.3d 991, 997 (Pa. Super. 2015) (en banc) (quotations and citation omitted) (emphasis added). This Court has explained:

> In determining the scope of duty property owners owe to business invitees, we have relied on Restatement (Second) of Torts § 343, which provides:
>
> > A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land, if but only if, he:

(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk to such invitees, and

(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

(c) fails to exercise reasonable care to protect them against the danger.

*See Neve v. Insalaco's*, 771 A.2d 786, 790 (Pa. Super. 2001) (quoting Restatement (Second) of Torts § 343. Moreover:

An invitee must demonstrate that the proprietor deviated from its duty of reasonable care owed under the circumstances. Thus, the particular duty owed to a business invitee must be determined on a case-by-case basis. . . . Restatement Section 343A provides that no liability exists when the dangerous condition is known or obvious to the invitee unless the proprietor should anticipate the harm despite such knowledge.

*Campisi v. Acme Markets, Inc.*, 915 A.2d 117, 119-20 (Pa. Super. 2006) quoting Restatement (Second) of Torts § 343A (1965) (some citations omitted).

Additionally, we point out that Pennsylvania has adopted Section 344 of the Restatement (Second) of Torts:

§ 344. Business Premises Open to Public: Acts of Third Persons or Animals

A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public **while they are upon the land for such a purpose**, for physical harm caused by the accidental, negligent, or intentionally harmful acts of third persons or animals, **and by the failure of the possessor to exercise reasonable care to**

(a) discover that such acts are being done or are likely to be done, or

> (b) **give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it**.

Restatement (Second) of Torts § 344 (emphasis added); ***see also Moran v. Valley Forge Drive-In Theater, Inc.***, 246 A.2d 875, 878 (Pa. 1968) (adopting Section 344). Section 344 further states that in limited circumstances, "this principle imposes upon a possessor of land the duty to police the premises[,]" which is explained in comment f:

> *f. Duty to police premises*. Since the possessor is not an insurer of the visitor's safety, he is ordinarily under no duty to exercise any care until he knows or has reason to know that the acts of the third person are occurring, or are about to occur. **He may, however, know or have reason to know, from past experience, that there is a likelihood of conduct on the part of third persons in general which is likely to endanger the safety of the visitor, even though he has no reason to expect it on the part of any particular individual. If the place or character of his business, or his past experience, is such that he should reasonably anticipate careless or criminal conduct on the part of third persons, either generally or at some particular time, he may be under a duty to take precautions against it, and to provide a reasonably sufficient number of servants to afford a reasonable protection**.

Restatement (Second) of Torts § 344 cmt. f (emphasis added).

With these standards and principles in mind, we address Appellants' first four claims together. Appellants claim the trial court erred by entering summary judgment for Defendants based on a finding that the attack of Ms. Borth was unforeseeable as a matter of law and that Defendants' duty to protect Ms. Borth was extinguished when she left the store's premises. First, we agree with the trial court's determination that Rite Aid's duty to protect its

invitees does not extend to an area beyond its parking lot, city blocks from its location. However, we disagree that it necessarily follows, under these facts, that the instant attack was unforeseeable as a matter of law, and that the criminal act was a superseding event.

Ms. Borth was a business invitee at the Rite Aid store, and, as such, Defendants owed her the highest duty of care. Defendants do not dispute this. However, whether Defendants should have anticipated or foreseen the danger of an attack, in this circumstance, is a matter in dispute.

In support of their argument, Appellants contend Geiger "stalked" Ms. Borth throughout the store while she was shopping, that Guard Perkins should have been aware of this, and that Guard Perkins had abandoned his post to go to his car for a few minutes. *See* Appellants' Brief, at 12-13. Appellants claim that Guard Perkins saw Geiger leave the store without making a purchase, and "even though [Guard Perkins] recognized that [] Geiger's behavior was bizarre and suspicious, Guard Perkins still did nothing." *Id.* at 14, citing Deposition of Deion Lamar Perkins, 1/24/19, at 20-22, 27.

Defendant Rite Aid owed Ms. Borth the "duty owed to any business invitee, namely, that [it] would take reasonable precaution against harmful third[-]party conduct that might be reasonably anticipated." *Paliometros v. Loyola*, 932 A.2d 128, 133 (Pa. Super. 2007) (citations omitted).

> The reason is clear; places to which the general public are invited might indeed anticipate, either from common experience or known fact, that places of general public resort are also places where what men can do, they might. One who invites all may reasonably expect that all might not behave, and bears responsibility for

- 9 -

injury that follows **the absence of reasonable precaution against that common expectation**.

*Feld v. Merriam*, 485 A.2d 742, 745 (Pa. 1984) (emphasis added).

Although Ms. Borth was no longer on Rite Aid property when Geiger attacked her, it is not entirely clear whether Rite Aid's precautions, or the Security Defendants actions, were reasonable or sufficient under the circumstances. Rite Aid acknowledged that this particular store had been evaluated just months before the attack, and a "Crimecast Evaluation" determined it to be in the highest of five categories of risk. *See* Plaintiff's Response in Opposition to Defendants' Joint Motion for Summary Judgment, 3/9/22, Exhibit D (dated October 6, 2017). The store's scores for individual crimes were as follows: 1,319 for homicide, 912 for robbery, 831 for rape, 890 for crimes against persons, and 848 for aggravated assault. *Id.* at 6. The scores are based on a scale of 0 to 2000, with 0 representing lowest risk and 2000 the highest; 100 is average. A score of 600 is 6 times higher than average, and a score of 25 indicates that the risk is ¼ the average. *Id.* at 10. The CAP Index Score represents the overall risk of crime at the address. The CAP Index Score for this particular Rite Aid store was 926; 9.26 times higher than average. *Id.* at 7.

Rite Aid contracted with SRI to provide it with security guards, and SRI subcontracted with Alpha Century to provide a guard for this store—here, Guard Perkins. Guard Perkins stated in his deposition that he saw Geiger leave after Ms. Borth, and that he thought it was "weird" that he did not buy

anything, but Guard Perkins was seemingly under the impression that once a

person left the inside of the store, he was no longer responsible:

> At least you're going to come in the store to get something, or talk to someone, whatever, not just stand there and leave right back out of the store[.] . . . [A]fter they left out of the store, I had, like, a peace—ease—ease, like, of mind[.] Like I don't have to worry about nothing else. . . . [W]e only controlled basically the store or whatever. What happens outside in the parking lot, [] we really couldn't do nothing,[] as far as like, incidents or whatever. Because that's outside of the store[.] . . . So, like once they basically got outside in the parking lot,[] we couldn't do nothing[.] That's what I was told. [W]hen [Geiger] went—when he left out of the store, I said it was, like weird. It was odd, whatever, because he just stood there with a Black & Mild [cigar], and he basically walked out—right [] back out of the store. . . . [I]t was suspicious to me because you're not just going to not talk to nobody and not do nothing, pick up anything, basically, and then walk back out the store.

Deposition of Deion Lamar Perkins, *supra* at 20-22, 27.

Guard Perkins also testified that there he received no training from

Alpha Century:

> Q: . . . I want to get an overview of, you know, what type of training, if any, you know, Alpha [Century] gave you before you started the job. Are you able—not much? They didn't give you much training? . . .You can answer.
>
> A: I can?
>
> Q: Yes, I mean, I noticed you're laughing, that's why I'm asking. They didn't give you much training?
>
> A: No. . . . Well, they just, like—I don't know. They don't get— **they haven't given me no training**.

*Id.* at 66-67 (emphasis added). *See id.* at 95 (A: "When he came in and

didn't do nothing, yeah, that was suspicious." Q: "But nobody at Alpha

[Century] trains you what to do in those situations, do they?" A: "No."). **See also id.** at 100 ("There was basically no training. Alpha [Century] didn't give me no training as far as any Incident Reports or as far as what I need to do at any of the customers or whatever, if someone stole or whatever. Like physical training, no.").

Even though Rite Aid acknowledged it was responsible for store security, it provided no oversight over the security guards and exercised no oversight over SRI. Robert Oberosler, who is responsible for the security of Rite Aid's 2,500 stores nationwide, testified that he was not aware of any training, selection, and supervision exercised over the stores' security guards by their direct employers. **See** Deposition of Robert Oberosler, 1/18/19, at 7-8, 47-48. With respect to Alpha Century, he stated:

> A: I am the decision-maker, final decision-maker on what guard agencies we hire.
>
> Q: Have you ever met anybody from management from Alpha Century Security?
>
> A: I may have, but I don't believe I have. . . . I've never had an established meeting that I can recall—what was the agency that you just said?
>
> Q: Alpha Century Security . . . Had you ever heard of that name before?
>
> A: Only in the course of this lawsuit.

**Id.** at 48-49. **See id.** at 108 ("I don't think I've ever heard of [Alp[ha Century]." Oberosler stated he was not aware that SRI contracted with Alpha Century, he was not aware of SRI's subcontracting selection process, nor was

- 12 -

he aware of Alpha Security's selection, training, or supervision processes. *Id.* at 105-08. Oberosler testified that Rite Aid did not intend to train or supervise the guards, had no policy for correcting misconduct, and did not inquire of the security agencies how the guards were trained or supervised, even though the contract between Rite Aid and SRI required Rite Aid to obtain a "performance audit" of the guards. *Id.* at 48, 54, 104-06. *See also* Amendment to Rite Aid-SRI Agreement, 12/1/14, at ¶ 14; Deposition of SRI Vice President Curt Kugler, 5/12/20, at 101-02 (Kugler acknowledging that despite Agreement stating "Supplier **must** implement a Performance Audit and Compliance Program approved by Rite Aid within 60 days of this Agreement being implemented[,]" this was not done.); id. at 103 (Kugler stating that, to his knowledge, Rite Aid never inquired whether Performance Audit and Compliance Program was implemented).

Furthermore, according to Kugler's deposition, SRI never vetted Alpha Century, did not train or supervise its subcontracted guards, did not inquire whether the subcontractor trained its guards, and had no idea whether the guards from subcontracted companies were even trained to look for suspicious activity. *See* Deposition of SRI Vice President Curt Kugler, *supra* at 20-23.

Appellants also point to the opinions of two security experts: Russell Kolins and Alexander Bolian. Kolins opined as follows:

> There are several levels of failures [that] led to the injuries sustained by Patricia Borth. There is a failure to adequately hire, train, and supervise security staff and the failure to have adequate security at the location in totality. The failures in the operation of the location directly led to the injuries suffered [by] Patricia Borth

in that the security officer assigned failed to act on a known and perceived threat.

\* \* \* \*

Based on my site inspection, review of the documents, materials and transcripts[,] video surveillance, and photographs identified in this report, as well as my knowledge and experience of security standards, theories[,] and principles[,] and my knowledge, experience, expertise[,] and training [in] security, Defendants materially deviated from the applicable security standards, laws[,] and regulations, substantially breached their duty to undertake reasonable care to provide a safe place for their customers and failed to protect their customers from a known and foreseeable harm. The Defendants demonstrated a culture of negligence with ample examples of violence and failures to follow up with even basic security remedies. The Defendants also failed to enforce a culture of security awareness in their stores and enforce and supervise those standards to industry best practices. These breaches and failures were fundamental, far-reaching[,] and outrageous[,] and created an unsafe environment with circumstances that caused the injuries to Patrica Borth[,] which were both foreseeable and preventable.

Report of Russell Kolins, at 26, 43-44.

Retail store expert Alexander Balian opined as follows:

Rite Aid failed to report or reprimand Guard Perkins' failures prior to the incident. This compromised safety and security at the store[,] and the failure to supervise or intervene with Guard Perkins lead Perkins to believe he had no responsibility to do his job. With security being nonexistent, this emboldened []Geiger to openly stalk and pursue Ms. Borth inside and outside the store. The assault of Ms. Borth was foreseeable by Rite Aid.

\* \* \* \*

From Guard Perkins' conduct[, for] which Rite Aid is responsible[], to employees working during [Guard] Perkins' shifts, to the actions taken by corporate headquarters, there are numerous failures at all levels by Rite Aid. These failures caused Ms. Borth's injuries and Ms. Borth would not have been attacked but for Rite

Aid's careless and reckless acts and omissions. These failure are systemic and Rite Aid's conduct is outrageous and demonstrates indifference at all levels. I fear for the safety of customers in its dangerous stores.

Report of Alexander Balian, at 7-8 (Exhibit AA).

In **Feld v. Merriam**, **supra**, our Supreme Court explained:

A program of security is not the usual and normal precautions that a reasonable home owner would employ to protect his property. It is, as in the case before us, an extra precaution, **such as personnel specifically charged to patrol and protect the premises**. Personnel charged with such protection may be expected to perform their duties with the usual reasonable care required under standard tort law for ordinary negligence. When a landlord by agreement or voluntarily offers a program to protect the premises, he must perform the task in a reasonable manner and where a harm follows a reasonable expectation of that harm, he is liable. **The duty is one of reasonable care under the circumstances. It is not the duty of an insurer and a landlord is not liable unless his failure is the proximate cause of the harm**.

485 A.2d at 747 (emphasis added). **See Pearson v. Philadelphia Eagles, LLC**, 220 A.3d 1154, 1159 (Pa. Super. 2022) (landowner is under affirmative duty to protect business visitor not only against known dangers but also against those which might be discovered with reasonable care; invitee must demonstrate proprietor deviated from its duty of reasonable care owed under the circumstances); **id.** (particular duty owed to business invitee must be determined on case-by-case basis); **see also Rabutino v. Freedom State Realty Co., Inc.**, 809 A.2d 933, 942 (Pa. Super. 2002) (denying summary judgment in favor of hotel where appellant showed hotel may have breached duty owed to decedent under Section 344; confrontation that killed decedent

"may reasonably be understood to have sprung directly and predictably from failure to respond adequately to events as they evolved[.]"); *id.* at 939 (defendant owed business invitee duty that it would take reasonable precaution against harmful third party conduct that might be reasonably anticipated).

Viewing the record in the light most favorable to Appellants, we are not convinced that Defendants are entitled to judgment as a matter of law. Genuine issues of material fact exist as to whether Defendants breached a duty to adequately police premises, and whether Defendants' purported negligence was a substantial factor in causing Ms. Borth's injuries.

We agree with Appellants' argument that, in light of the record here, where even Guard Perkins was suspicious of Geiger's behavior, but believed he was unable to do anything once the individuals had exited the store, there are triable issues of fact as to whether Guard Perkins was adequately trained, if at all, and whether he should have warned Ms. Borth, suggested she call for an escort, or acted on his suspicions in some manner. Further, our review of the record indicates there are genuine issues of material fact as to whether Rite Aid, SRI, and Alpha Century were negligent, or even reckless, with respect to their hiring, training, and oversight responsibilities pertaining to security. There are serious issues here as to whether there was an absence of reasonable precaution at various stages, particularly in light of the Crimecast Evaluation presented. *See Truax*, *supra*. Given this record, and in light of what appears to be questions of lack of oversight and a failure to comply with

agreed-upon procedures and protocols, we conclude that there is evidence that would allow a fact-finder to render a verdict in favor of the Appellants.

Further, since we have concluded that Appellants have viable causes of action, and the trial court dismissed the punitive damages claim on the ground that Appellants did not, *see* Trial Court Opinion, *supra* at 7, we must reverse dismissal of the punitive damages claim. That matter will be for the trial court to determine on remand after the evidence is presented to the trier of fact.

Accordingly, we reverse the orders granting summary judgment. *Newell*, *supra*.[3]

Orders reversed. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 8/1/2025

---

[3] With respect to Appellants' issue regarding the trial court's jurisdiction, we note that Ms. Borth passed away on April 11, 2022, and a suggestion of death was filed on May 9, 2022, prior to entry of the orders granting summary judgment. On September 23, 2022, Appellants filed an Application for Substitution of Party, which this Court granted on October 24, 2022. *See* Pa.R.C.P. 2322, 2355.

- 17 -